In the Matter of the Application of ARTHUR H. LAMBORN, Individually and as a Member of the Firm of LAMBORN & Co., Appellant, against NEW YORK COTTON EXCHANGE, Respondent.

First Department, December 1, 1922.

Corporations — membership corporation — mandamus to compel reinstatement of petitioner as member of New York Cotton Exchange — petitioner suspended under by-law authorizing suspension for " conduct " detrimental to best interest of corporation — decision of corporation cannot be reviewed by court where there is any evidence to support charge — petitioner charged with furnishing continuous quotations of sales on Exchange — quotations furnished without petitioner's knowledge and against his instructions — " conduct " means personal action or transaction — petitioner did not violate by-law — petitioner not required to seek reinstatement before appealing to court — peremptory mandamus order granted.

The action of a membership corporation in suspending a member for violations of its by-laws cannot be reversed by the Appellate Division where there is any evidence to support the charge.

The petitioner, a member of the respondent New York Cotton Exchange, was charged with furnishing continuous quotations of sales on the Exchange, which conduct was alleged to constitute a violation of a by-law of the Exchange authorizing the suspension of a member " For any conduct detrimental to the best interest of the Exchange or to the welfare of the United States." Testimony was taken before the supervisory committee of the Exchange which made a report to the board of managers that the petitioner was found guilty and, after a hearing before the board of managers, he was suspended for six months. The evidence established that the petitioner's firm, of which he was the senior member, had two offices; that the petitioner made his headquarters at the main office and visited the branch office only at rare intervals; that the quotations were given over the telephone by someone at the branch office in response to a call by an employee of the American Cotton Exchange who, in asking for quotations, gave the name of a client of petitioner's firm; that the petitioner gave explicit and positive directions to employees not to furnish continuous quotations of sales on the New York Cotton Exchange; that if said quotations were furnished as alleged, as to which there is a conflict in the evidence, they were furnished in violation of instructions and without the knowledge of the petitioner.

*Held*, that the petitioner cannot be suspended for violation of the by-law of the respondent corporation unless it is clearly shown that the dereliction charged against him comes within the scope of the by-law, and the by-law cannot be extended by implication to include anything that is not clearly within its scope;

That the word " conduct " as used in said by-law and as applied to a member

of the respondent corporation means some personal action or transaction on his part that was detrimental to the respondent;

That the furnishing of continuous quotations by a telephone operator or operators in the employ of the petitioner's firm, without his knowledge and against his orders, did not constitute a violation of said by-law, and his suspension from membership was, on the facts proven, improper.

The petitioner was not required to apply to the respondent corporation for reinstatement before applying to the court for a mandamus order to compel the respondent to reinstate him.

The petitioner not having been guilty of the charge preferred against him by the respondent corporation, is entitled to a peremptory mandamus order directing his reinstatement.

APPEAL by the petitioner, Arthur H. Lamborn, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 6th day of July, 1922, denying petitioner's application for a peremptory mandamus order commanding respondent to reinstate petitioner to full membership in the New York Cotton Exchange.

*Van Doren, Conklin, McNevin & McClenthen* [*Louis O. Van Doren* of counsel; *Charles Thaddeus Terry* with him on the brief], for the appellant.

*Cadwalader, Wickersham & Taft* [*Henry W. Taft* of counsel; *George Coggill* and *Francis Dean* with him on the brief], for the respondent.

PAGE, J.:

Arthur H. Lamborn, the senior member of Lamborn & Co., is a member of a number of exchanges, among which is the New York Cotton Exchange. The principal office of the firm would seem to be at 132 Front street. I say "would seem to be" for the reason that it is not definitely so stated in the papers, but the testimony shows that, while the firm have 28 telephones in their order room at No. 7 Wall street, they have about 200 telephones in their order room at 132 Front street, and Mr. Lamborn makes the latter office his headquarters, visiting the office at 7 Wall street only at rare intervals. The office at 7 Wall street is in charge of a member of the firm by the name of Tameling. Charges were preferred by the board of managers against Mr. Lamborn for having furnished continuous quotations of sales on the Cotton Exchange in violation of the firm's agreement with the Western Union Telegraph Company and the New York Cotton Exchange, which was claimed to be a violation of section 81 of the by-laws. Testimony was taken before the supervisory committee of the Exchange, which made a report to the board of managers that Arthur H. Lamborn was found guilty as charged. The board of managers granted a hearing and heard Mr. Lamborn, and the same day voted to suspend him from the Exchange for a period of six months.

We cannot review the evidence and reverse the decision of the governing body of the Exchange, unless there is no evidence tending to support the charge.   I will not in this opinion state the evidence in detail, but will only develop the facts sufficient to present the law points which are involved.

One Thayer was in the employ of the American Cotton and Grain Exchange and engaged in writing the quotations upon the quotation board in the Exchange room.   He testified that at first this information was transmitted to him by various members of the New York Cotton Exchange, who obtained the information over their own telephones which they had installed in the board room, but that this service was unsatisfactory, because of the fact that the broker who received the information would have an advantage over the other brokers who were dependent upon him for the information, and if he delayed giving it for publication upon the quotation board, the others were at a disadvantage.   By reason of this fact a telephone was installed alongside of the quotation board with a breast transmitter and a receiver that could be attached to the head.   Thereafter the method of obtaining the quotations was to call up in rotation the various Cotton Exchange houses and give the name of a customer of the firm and ask for the quotation.   He testified that one of the houses on this list was Lamborn & Co., and he called up on telephone 460 Rector.   It is conceded that this telephone was in the office of Lamborn & Co., at 7 Wall street.   He said that a person in that office would frequently give him continuous quotations for five minutes, and he said that he would call up this number ten or fifteen times a day.   He further testified that after the first of the year he was unable to get any more quotations from the firm of Lamborn & Co.   It was proved that the contract for the telephone that was installed alongside of the quotation board was signed on December thirteenth, and the final connection was established on December 31, 1921.   Thayer testified that he used the name of Rose & Son, who were customers of Lamborn, when he called up.

Another witness who was called was one Watson, who testified that his assistant gave the name of Edward L. Patton & Co., who also were customers of Lamborn & Co., when he called up and obtained the quotations.   Watson was connected with the firm of Edward L. Patton & Co., at least to the extent of trading with them on joint account.   He said that he at times received quotations for a period of five minutes.   Lamborn & Co. produced the two men that had charge of the twenty-eight telephones in what they call their order room, and they specifically and unequivocally deny having given any such quotations.   It was also proved that the firm had given

orders that no continuous quotations were to be given, and nothing was to be done that would seem to violate, or might be construed as violating, the order. The assistant to the general manager of the office made affidavit to this order, and that his duties brought him in continuous contact and supervision of the order room and that he had never seen or heard any one giving out continuous quotations. A similar affidavit was made by the person directly in charge and supervising the order room. If we were to decide this question on the weight of evidence, I would unhesitatingly hold that the decision of the committee and of the board of managers was contrary to the weight of the evidence.

It would appear that the most that could be charged against Arthur H. Lamborn was that by reason of some neglect on his part this communication of quotations was not discovered by him and stopped. The learned justice at Special Term says that it is inconceivable that this course of dealing could have continued in a man's own office for a period of several months and he not have known it, but in this he entirely overlooks the fact that Lamborn was not in this office but at 132 Front street, another office of the firm, and that the office at 7 Wall street was in charge of one of his partners. The learned counsel for the respondent states in his brief, " the New York Cotton Exchange does not claim that Mr. Lamborn *personally* furnished or *knowingly* authorized his employees to furnish such continuous quotations from his office to the American Cotton Exchange, but the evidence does show that members of his office force had repeatedly furnished from his office such quotations to members and employees of the American Cotton Exchange, and that he failed to prevent this. It also shows that he did not personally supervise the ticker and telephone service in his office."

The portion of the by-laws of the corporation which it is claimed gives the power to the board to suspend Lamborn reads as follows:

" Suspension and Explusion.

" Sec. 81. Any member of the Exchange may be suspended from all his rights of membership for a term not exceeding one year, or may be expelled from membership in the Exchange, by the Board of Managers for any of the following causes: * * *

" (g) For any conduct detrimental to the best interest of the Exchange or to the welfare of the United States."

Can Lamborn be properly charged with conduct detrimental to the best interests of the Exchange or the welfare of the United States on the evidence presented? We must bear in mind that the power of the board to expel or suspend a member is given by this by-law, and that the member when he accepts membership agrees he shall be governed by the by-laws of the association, and that it

must be shown clearly that the dereliction charged against a member comes within the scope of the by-law, and that it cannot be extended by implication to include anything that is not clearly within its content. Conduct, as defined by the Standard Dictionary, means "the way in which a person acts or lives; behavior." In the Century Dictionary it is defined as "personal behavior or practice; way of acting generally or on a particular occasion; course of action; deportment." The Oxford Dictionary: "manner of conducting one's self or one's life; usually with more or less reference to the moral quality (good or bad) (now the leading sense)." Webster: "Manner of guiding or carrying one's self; personal deportment; mode of moral action; behavior." Worcester: "manner of life; behavior; deportment; demeanor; carriage; manners." Thus it would seem that the word "conduct," as applied to a member of the Exchange, would mean some personal action or transaction on his part that was detrimental to the Exchange, and that it was extending the definition beyond any meaning that could be attached to it to hold him responsible for the action of telephone boys in a branch office in which he was not present and to which his attention had not been called. If the Exchange desired to make the giving out of these continuous quotations by any one in connection with a member of the Exchange, whether with his knowledge or consent or not, a subject for expulsion, it would be entirely competent for it to express the same clearly in its by-law. This respondent has been warned that on this subject it "can take nothing by implication. Forfeitures depend upon clear and explicit language." (*People ex rel. Elliott* v. *N. Y. Cotton Exchange,* 8 Hun, 216.)

The purpose of the by-law expressed in terms such as this one is very well stated in *Matter of Haebler* v. *N. Y. Produce Exchange* (149 N. Y. 414, 428): "The purpose of the appellant's incorporation is not the transaction of business for gain, but to elevate and maintain the business standard of its members. This can be accomplished only by requiring them to adopt and follow just and equitable principles in all their commercial transactions and dealings. To secure that end the appellant has the right to insist that their dealings shall be conducted upon principles of integrity, honesty and fairness. Any dishonest or unfair transaction by a member is in direct contravention of the purpose and intent of the appellant's organization, and it is authorized to censure, suspend or expel a member who thus offends. If its members are not required in all their commercial dealings and business transactions to adhere to those principles, an essential purpose for which the appellant was organized will be subverted, its reputation and the reputation of its members for honest dealing lost, and its usefulness and impor-

tance greatly diminished if not totally destroyed." It is such conduct and dealings as above set forth that would subject a member of the Exchange to its disciplinary powers.

Mr. Lamborn has been suspended for acts found to have been committed by employees of his firm, without his knowledge and against his orders, on the ground that he did not personally supervise the telephone operators in a branch office which was not under his personal supervision or management. The head of a firm could not spend his time listening to the conversations of his telephone operators, and was not required to be personally present at all times in a branch office for the sole purpose of supervising the telephone operators. He had placed one of his partners in charge, and had given orders forbidding the doing of the act for which he has been held personally responsible, and for which he has been stigmatized by the reading of the order for his suspension from the rostrum of the Exchange, stating that after due trial he had been found guilty of conduct detrimental to the best interest of the Exchange. This is not a case of holding the master civilly liable for damages caused to innocent third persons by the negligent or wrongful act of a servant. But it is holding the master liable to forfeiture of his proprietary rights in his seat in the Exchange, depriving him of the pursuit of his business, and, therefore, subjecting him to consequences highly penal, for the act of a servant committed, not alone without his knowledge or consent, but against his express orders. The law does not recognize any such liability. " For injuries by the negligence of a servant while engaged in the business of the master, within the scope of his employment, the latter is liable for compensatory damages; but for such negligence, however gross or culpable, he is not liable to be punished in punitive damages unless he is also chargeable with gross misconduct. Such misconduct may be established by showing that the act of the servant was authorized or ratified, or that the master employed or retained the servant, knowing that he was incompetent, or, from bad habits, unfit for the position he occupied. Something more than ordinary negligence is requisite; it must be reckless and of a criminal nature, and clearly established." (*Cleghorn* v. *N. Y. C. & H. R. R. R. Co.*, 56 N. Y. 44, 47.) This rests upon the principle that punitive damages are awarded by way of punishment of the offender, and as a warning to others, and can only be awarded against one who has participated in the offense.

Not alone has the respondent not shown participation by Mr. Lamborn or members of his firm in the act of the servant, but its counsel expressly states that it is not claimed that he knowingly authorized it; and the evidence is not alone that he did not in

any way connive at or participate in the act, but that he expressly forbade its commission.

There is no force in the contention of the Exchange that Lamborn did not exhaust his remedy within the Exchange, in that he failed to apply for reinstatement. The remedy that a person must exhaust before he can apply to a court is such as is provided for review of the determination by appeal. An application for reinstatement would not in any way involve the review of the question determined on his expulsion. It would be a matter of grace and not a reversal of the determination.

It developed, after these proceedings were closed in the Exchange, that the American Exchange was indicted for operating as a "bucket shop." Therefore, its illegal practices would have been furthered by the alleged acts of the employees of Lamborn & Co. There is nothing to show that the employees even knew that the quotations were obtained for such use, for the witnesses who testified to the furnishing of the quotations stated that they used the names of *bona fide* customers of Lamborn & Co. in order to obtain the information. We are in thorough sympathy with the efforts of the Exchange to suppress bucket shops; but, however laudable may be their desire in this regard, it is not permissible to punish the innocent or to inflict penalties not authorized by the by-laws. We hold, therefore, that appellant could not be disciplined upon the evidence adduced for a violation of the by-laws as now framed.

The order should, therefore, be reversed, with ten dollars costs and disbursements, and the motion for a peremptory mandamus order granted, with fifty dollars costs.

CLARKE, P. J., DOWLING, GREENBAUM and FINCH, JJ., concur.

Order reversed, with ten dollars costs and disbursements, and motion granted, with fifty dollars costs.