362 So.2d 1350 (1978)
DIVISION OF PARI-MUTUEL WAGERING, DEPARTMENT OF BUSINESS REGULATION, State of Florida, Petitioner,
v.
W.F. CAPLE, Respondent.
No. 52865.
Supreme Court of Florida.
September 21, 1978.
*1351 William A. Hatch, Staff Atty. for Dept. of Business Regulation, Tallahassee, for petitioner.
L. Edward McClellan, Jr., of Rentz, McClellan & Haggard, Miami, for respondent.
ENGLAND, Chief Justice.
By petition for a writ of certiorari, the Division of Pari-Mutuel Wagering of the Florida Department of Business Regulation requests that we review a decision of the Third District Court of Appeal certified by that court as having passed upon the following question of great public interest:
"Is a thoroughbred horse trainer an absolute insurer under Administrative Rule 7E, Section 1.06(15) and (16)?"
In its decision, reported at 350 So.2d 488, the district court held that although the cited provisions of the Florida Administrative *1352 Code impose strict liability on horse trainers for compliance with applicable regulations, those rules are invalid under the principles of law announced in State ex rel. Paoli v. Baldwin, 159 Fla. 165, 31 So.2d 627 (1947). In Baldwin, this Court held predecessor rules to the same effect unconstitutional. In reality, the parties now before us argue not how the certified question should be answered  they agree it requires a "yes" answer  but whether Baldwin should be reexamined and overruled on the basis of changed circumstances during the past thirty years. Since the district court was bound by our Baldwin decision,[1] it quite properly elected to certify to us an important question of established law which it was unable to alter despite a perceived change in the jurisprudence throughout the country in this area of strict liability. We accept jurisdiction under Article V, Section 3(b)(3) of the Florida Constitution.
The division is charged with regulatory authority over Florida's pari-mutuel wagering industry. Caple is a trainer of thoroughbred horses. On August 18, 1974, the division's investigator searched the barn area and tack room assigned to Caple at Calder Race Course and discovered three hypodermic needles and syringes containing a vitamin substance in an unlocked cabinet. Caple was charged with violating Florida Administrative Code Rules 7E-1.06(15) and (16), which provide:
"(15) No person within the grounds of a racing association where race horses are lodged or kept, shall have in or upon the premises which he occupies or has the right to occupy, or in his personal property or effects, any prohibited drugs, or any hypodermic syringe, hypodermic needle, or other device which could be used for the injection or other infusion into a horse of a drug, stimulant or narcotic, without first securing written permission from the stewards. Every racing association, upon the grounds of which race horses are lodged or kept, is required to use all reasonable efforts to prevent the violation of this rule.
(16) All medicines, drugs, or medications of any nature shall be kept or stored at all times in a securely locked cabinet, locker, or room. It is the responsibility of the trainer to see that this rule is complied with. Any trainer or other person found guilty of the violation of this rule shall be fined or suspended, or both."
After a formal hearing, the course stewards found that Caple had "failed to meet his burden of overcoming the prima facie evidence" of rules violations and suspended him for 60 days.[2] Caple promptly obtained a temporary injunction from the circuit court to restrain enforcement of the suspension order while he undertook administrative remedies. After Caple unsuccessfully exhausted his administrative remedies and certiorari to review his suspension was denied by the Third District Court of Appeal,[3] the division moved in the circuit court to dissolve the earlier restraining order and Caple moved to make the injunction permanent. After hearings on the motions, the circuit court granted the permanent injunction and declared Rules 7E-1.06(15) and (16) unconstitutional on the basis of our Baldwin decision. On appeal the district court upheld the trial judge's decision, but certified the question to this Court "because of changes in the Code ... and ... the considerable lapse of time since the Baldwin opinion."[4]
Baldwin involved a trainer who was suspended when it was discovered that a stimulant had been administered to one of his horses. Baldwin challenged the validity of *1353 two State Racing Commission rules prohibiting the use of drugs on horses which provided that
"[t]he trainer shall be the absolute insurer of ... the condition of the horses ... regardless of the acts of a third party." 159 Fla. at 167, 31 So.2d at 629.
The Court initially upheld the validity of the rules, reasoning that horse racing and wagering are subject to strict governmental regulation and that absolute insurer provisions represent a valid exercise of the state's police power over the "privilege" of holding a trainer's license. On rehearing, however, the Court reversed itself and invalidated the rules by a 4-3 vote. The majority relied on Mahoney v. Byers, 187 Md. 81, 48 A.2d 600 (1946), to hold that the rules in question deprived Baldwin of a "valuable property right"[5] without due process of law by creating an irrebuttable presumption of guilt.
The division contends that Baldwin found only that an irrebuttable presumption of guilt violates due process, but that a majority of courts have now distinguished both that decision and its progenitor, Mahoney v. Byers, and have upheld absolute insurer rules on the basis of the state's power to impose strict liability as a reasonable exercise of its regulatory authority over horse racing. The gist of the more recent decisions is that an absolute insurer rule does not establish a conclusive presumption of responsibility on the trainer, but rather imposes strict liability as a condition for holding the license. The division suggests that we overrule Baldwin because the horse racing industry has grown in complexity and as a source of revenue in the last thirty years, and because the development of sophisticated drugs which are difficult to detect makes an absolute insurer rule necessary to protect the sport's integrity. Caple, of course, urges that we adhere to Baldwin.
Although rejected in Baldwin and Mahoney, absolute insurer rules for horse trainers have indeed received generally favorable treatment in more recent court decisions. Absolute insurer rules substantially identical to those considered in Baldwin and Mahoney have been upheld against due process and other attacks in California,[6] New Jersey,[7] New Mexico,[8] Ohio,[9] and West Virginia.[10] The Supreme Court of California explained why it rejected the conclusion adopted in Baldwin and Mahoney:
"State v. Baldwin ... would at first appear persuasive since rule 117, there considered, somewhat parallels rule 313 now under attack. But that case did not consider the power of a state to impose strict liability, the existence of which is the fundamental basis of our determination. Also, it would appear that the decision in the Baldwin case was influenced decisively by analogy to Mahoney v. Byers ... where the mechanics rested in the employment of a presumption as conclusive evidence. .. .
[I]t is not unreasonable, arbitrary or capricious to provide that the trainer guarantee the condition of a horse running in *1354 a race upon the results of which there is wagering."
31 Cal.2d at 411-12, 189 P.2d at 23.
Similar reasoning was employed by the Supreme Court of Appeals of West Virginia:
"[W]e think it imperative that, in the conduct of racing in this State ... there should and does exist the power to make rules which will effectually guard against fraud and deception in racing, which may be effected through administering drugs or narcotics, or by any other means... . Every consideration surrounding the business of operating a race track, and the racing of horses thereon, seems to us to call for firm and rigid rules placing responsibility and imposing penalties for their violation. Conceding that the rule ... is harsh and may, in some instances, result in injustice to innocent people, we think the rule can be justified on the grounds of public policy, because it is the only effective means by which fraud and deceit in connection with horse racing can be minimized." 133 W. Va. at 202-03, 55 S.E.2d at 274-75.
The Ohio Court of Appeals dealt with the absence of proof of knowledge or intent by saying:
"Horse racing, at its best, is difficult to control, and would be practically impossible to regulate if every governing rule and regulation was made dependent for validity upon the knowledge or motives of the person charged with a violation... .
[W]hen viewed in the light of its overall purpose, the business to which it relates, and the potential evil which it is designed to prevent, we cannot say that the rule is unreasonable. Manifestly, it would be almost impossible to prove guilty knowledge or intent in cases of this kind, and the futility of prosecutions under a rule requiring probative evidence of guilty knowledge and intent would eventually leave the public interest and welfare to the mercy of the unscrupulous." 3 Ohio App.2d at 426, 210 N.E.2d at 733.
Even Maryland has now distinguished its earlier decision in Mahoney and approved a slightly modified strict liability rule.[11]
Additionally, the United States Court of Appeals for the Fourth Circuit has rejected the contention that immediate suspension under an absolute insurer rule violates procedural due process. Hubel v. West Virginia Racing Commission, 513 F.2d 240 (4th Cir.1975).
So far as we can determine, the Illinois Supreme Court is the only court that has held the absolute insurer rule unconstitutional since Baldwin. Brennan v. Illinois Racing Board, 42 Ill.2d 352, 247 N.E.2d 881 (1969). It is noteworthy, however, that in both Baldwin and in Brennan the prohibited drugs had in fact been administered to the horse by someone other than the trainer.
On review of these more recent authorities, we are now persuaded that Florida should align itself with the wellreasoned majority view. To protect the integrity of this unique industry, it is really immaterial whether "guilt" should be ascribed either directly or indirectly to the trainer. The rules were designed, and reasonably so, to condition the grant of a trainer's license on the trainer's acceptance of an absolute duty to ensure compliance with reasonable regulation governing the areas over which the trainer has responsibility. Whether a violation occurs as a result of the personal acts of the trainer, of persons under his supervision, or even of unknown third parties, the condition of licensure has been violated by the failure to provide adequate control, and the consequence of the default is possible suspension of the trainer's license or a fine.[12] We have no doubt *1355 that a rule which both conditions a license and establishes with specificity reasonable precautionary duties within the competence of the licensee to perform is both reasonable and constitutional.
As regards the proposition that due process invariably requires proof of guilty knowledge before punishment can be inflicted, that notion was long ago put to rest by the United States Supreme Court. See, e.g., United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922); Shevlin-Carpenter Co. v. Minnesota, 218 U.S. 57, 30 S.Ct. 663, 54 L.Ed. 930 (1910). It is now well established that in areas of activity requiring strong police regulation to protect public interests, strict liability may be imposed upon persons "otherwise innocent but standing in responsible relation to a public danger." United States v. Dotterweich, 320 U.S. 277, 281, 64 S.Ct. 134, 88 L.Ed. 48 (1943). Horse racing is such an area of activity. Western Turf Association v. Greenberg, 204 U.S. 359, 27 S.Ct. 384, 51 L.Ed. 520 (1907).
In 1936 we held that, because racing for money could be prohibited altogether in Florida, the legislature may condition a license to engage in legalized racing upon compliance with any rule that is "reasonably appropriate to the accomplishment of the purposes of the act."[13] In the interest of protecting both the health of thorough-bred horses and the integrity of the sport from which the state derives revenues, the state has a valid objective in seeking to prevent drugging of race horses. An absolute insurer rule for horse trainers represents a reasonable and valid exercise of the state's police power to achieve that objective.
Caple contends that even if absolute insurer rules generally are permissible, these rules are unreasonable because they prescribe punishment whether or not there is a showing that the evil which the rules are designed to prevent  that is, the drugging of a race horse  has in fact occurred.[14] We do note that all prior cases upholding rules as being reasonable have involved a factual context in which a horse had actually been drugged and raced. Rules 7E-1.06(15) and (16), of course, prohibit the mere possession of unauthorized drugs or any device by which such drugs could be administered in an area where horses are kept, and they require that all medications, whether authorized or not, be kept in locked storage.[15]
Caple bases this challenge to these rules on Jefferson v. Sweat, 76 So.2d 494 (Fla. 1954), where we held unreasonable a presumption that mere possession of a federal gambling stamp without regard to evidence that some gambling had actually taken place was prima facie evidence of a gambling law violation. Jefferson is not persuasive here, however, principally because the prohibitory regulation here quite reasonably achieves the prophylactic statutory goal, while the regulation in Jefferson had no like relevance to the law's objective. A statute which prohibits possession of federal gambling stamps could be effectively enforced and still not prevent unlawful gambling activities; it is as easy to gamble without a stamp as with it. In contrast, total compliance with Rules 7E-1.06(15) and (16) would eliminate illegal drugging since all access to prohibited drugs and devices is *1356 eliminated. Plainly, Rules 7E-1.06(15) and (16) constitute a reasonable means of eliminating or minimizing the possibility of illegal drugging, by placing total responsibility on the person most capable of controlling the problem.[16]
The certified question is answered in the affirmative, and we hold that these absolute insurer rules for thoroughbred horse trainers are valid. Our decision in Baldwin is overruled, and the decision of the district court below is quashed. This cause is remanded with directions to dissolve the permanent injunction entered by the circuit court.
It is so ordered.
BOYD, OVERTON and SUNDBERG, JJ., concur.
HATCHETT, J., concurs in result only.
NOTES
[1] Hoffman v. Jones, 280 So.2d 431 (Fla. 1973).
[2] Florida Administrative Code Rule 7E-1.09(2) provides that "stewards shall have general supervision and authority over owners, trainers, jockeys, grooms and other persons attendant on horses, and also over the premises... ." Rule 7E-1.09(5) empowers them to punish violators "at their discretion ... by suspension ... for a period not exceeding sixty (60) days, or by fine not exceeding $200.00, or both." Procedures for hearings on violations are set forth in Rule 7E-1.09(21).
[3] Caple v. Division of Pari-Mutuel Wagering, 321 So.2d 475 (Fla. 3d DCA 1975).
[4] 350 So.2d at 489.
[5] There is no indication as to the basis for the Court's conclusion that the trainer's license, which had been characterized as a "privilege" in the initial opinion upholding the rules' validity, was to be treated as a "valuable property right" within the protective ambit of the Constitution. It seems apparent, however, that the result on rehearing was attributable primarily to that change in characterization.
[6] Sandstrom v. California Horse Racing Bd., 31 Cal.2d 401, 189 P.2d 17, cert. denied, 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369 (1948).
[7] Dare v. State of New Jersey, 159 N.J. Super. 533, 388 A.2d 984 (N.J.Super.Ct.App.Div., opinion filed April 11, 1978).
[8] Jamison v. State Racing Commission, 84 N.M. 679, 507 P.2d 426 (1973); Sanderson v. New Mexico State Racing Commission, 80 N.M. 200, 453 P.2d 370 (1969).
[9] O'Daniel v. Ohio State Racing Commission, 37 Ohio St.2d 87, 307 N.E.2d 529 (1974); Fogt v. Ohio State Racing Commission, 3 Ohio App.2d 423, 210 N.E.2d 730 (1965).
[10] State ex rel. Spiker v. West Virginia Racing Commission, 135 W. Va. 512, 63 S.E.2d 831 (1951); State ex rel. Morris v. West Virginia Racing Commission, 133 W. Va. 179, 55 S.E.2d 263 (1949).
[11] Maryland Racing Commission v. McGee, 212 Md. 69, 128 A.2d 419 (1957).
[12] The determination of whether and to what extent the trainer is to be penalized is discretionary with the track stewards. See note 2 above. It is possible that in exceptional cases involving acts totally beyond the trainer's control, as where there is clear evidence that protective measures have been frustrated by force, no punitive action will be taken. In any event, administrative and judicial review are available to protect against a totally arbitrary or discriminatory exercise of the stewards' discretion, a contention not raised by Caple in this proceeding.
[13] State ex rel. Mason v. Rose, 122 Fla. 413, 419, 165 So. 347, 349 (1936). See also Hialeah Race Course, Inc. v. Gulfstream Park Racing Association, Inc., 37 So.2d 692 (Fla. 1948), appeal dismissed, 336 U.S. 948, 69 S.Ct. 885, 93 L.Ed. 1104 (1949).
[14] Caple also contends that he should not be subject to penalties because the drugs found by the stewards were harmless vitamins. Even if that fact were proved, however, it would not be dispositive inasmuch as the possession of syringes and needles is in itself a violation of Rule 7E-1.06(15), and Rule 7E-1.06(16) expressly prohibits the unsecured storage of "medication of any kind."
[15] It is unnecessary under these provisions to prove that drugs have actually been administered to a horse, or that any horse has been raced in a drugged condition. In fact, no such allegation was made in this case.
[16] There is a provision in these rules, moreover, for authority to possess otherwise prohibited matter for legitimate purposes. No similar exemption was present in the statute under consideration in Jefferson.