William P. COONEY, Plaintiff,

v.

AMERICAN HORSE SHOWS ASSOCIATION, INC., Defendant.

No. 78 Civ. 4982 (JMC).

United States District Court,
S. D. New York.

April 3, 1980.

Hale & Dorr, Boston, Mass. (Harold Hestnes, John G. Fabiano and William F. Lee, Boston, Mass., of counsel), and Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Robert L. Laufer and Earl H. Doppelt, New York City, of counsel), for plaintiff.

Cahill, Gordon & Reindel, New York City (Thomas F. Curnin, Ira A. Finkelstein and Daniel A. Fried, New York City, of counsel), for defendant.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

The defendant's motion for summary judgment is granted. Fed.R.Civ.P. 56.

### FACTS

Plaintiff, a horse trainer who is a member of defendant American Horse Shows Association, Inc. ["AHSA"], brings this antitrust action challenging his suspension pursuant to certain disciplinary regulations of the defendant. Specifically, he contends that the defendant's "Rule on Drugs and Medication" ["Drug Rule"] creates a standard of liability which is unreasonable and arbitrary, and therefore violates sections one and two of the Sherman Act, 15 U.S.C. §§ 1, 2, and the common law of New York.

The AHSA is a not-for-profit membership organization organized under the laws of New York, for the purpose of promoting the best interests and fairness of shows and competitions recognized by it. To achieve this goal, the AHSA promulgates and enforces rules governing competitions. Affidavit of James J. Fallon at 2 (filed Oct. 25, 1978).

The regulation challenged in this action, Rule III, Part 1, Section 5, prohibits the administration of forbidden drugs and medications to horses participating in shows. In pertinent part the rule provides:

> No horse shall be shown in any class at a show recognized by the Association if it has been administered in any manner any forbidden substance. A forbidden substance is any stimulant, depressant, tranquilizer or local anesthetic which might affect the performance of a horse (stimulants and depressants are defined as medications which stimulate or depress the circulatory, respiratory, or central nervous systems).

. . . . .

Trainers in the absence of substantial evidence to the contrary are responsible

for a horse's condition and to know all the rules and regulations of the Association, and, the penalty provisions of said rules.

．　　．　　．　　．　　．

A trainer of a horse found to have received such forbidden substance shall be subject to whatever penalty is assessed by the Hearing Committee and may be fined no more than $1,000.00 and may be suspended from all competition in recognized shows for a period of one year for the first offense, said suspension to be served at any time at the discretion of the Hearing Committee. The horse may be suspended for any period of time specified by the Hearing Committee.

American Horse Shows Association Rule III, Part 1, Section 5(a), (c), (d).[1] On September 28, 1978, plaintiff was suspended from participating in recognized shows for

---

1. The full text of the drug rule is set out below:
 Sec. 5 Drugs and Medications.
 (a) No horse shall be shown in any class at a show recognized by the Association if it has been administered in any manner any forbidden substance. A forbidden substance is any stimulant, depressant, tranquilizer or local anesthetic which might affect the performance of a horse (stimulants and depressants are defined as medications which stimulate or depress the circulatory, respiratory, or central nervous systems). Also prohibited are any drugs, regardless of how harmless or innocuous they might be, which by their very nature might mask or screen the presence of the aforementioned prohibited drugs, or prevent or delay testing procedures.
 Except for substances on the pastern area of Walking Horses the full use of modern therapeutic measures for the improvement and protection of the health of the horse including phenylbutazone is permitted, unless the drug given also may stimulate or depress the circulatory, respiratory, or central nervous system.
 EXHIBITORS ARE CAUTIONED AGAINST THE USE OF MEDICINAL PREPARATIONS AND TONICS OF ANY KIND, THE INGREDIENTS AND QUANTITATIVE ANALYSIS OF WHICH ARE NOT SPECIFICALLY KNOWN, AS MANY OF THEM CONTAIN FORBIDDEN SUBSTANCE.
 (b) A trainer is defined as "Any adult or adults who has the responsibility for the care, training, custody or performance of a horse." Said person must sign the entry blank of any recognized show whether said person be an owner, rider, agent and/or coach as well as trainer. Where a minor exhibitor has no trainer, a parent or guardian must sign and assume responsibility of trainer. The name of the trainer must be designated as such on the entry blank. It shall be the responsibility of show management to see that entry blanks contain all of the required information.
 (c) Trainers in the absence of sub. antial evidence to the contrary are responsible for a horse's condition and to know all the rules and regulations of the Association, and, the penalty provisions of said rules. If any trainer is prevented from performing his duties, including responsibility for the condition of the horses in his care, by illness or other cause, or is absent from any show where horses under his care are entered and stabled, he shall immediately notify the Horse Show Secretary, and, at the same time, a substitute shall be appointed by the trainer, and such substitute shall place his name on the entry blank forthwith. Such substitute shall be equally responsible with the regular trainer for the condition of the horses in his care.
 The trainer and owner acknowledge that the trainer represents the owner regarding horses being trained or managed, entries, scratches for any reason, and any act performed on any horse under the care and custody of the trainer.
 Any trainer or person subject to these rules who administers, attempts to administer, instructs, aids, conspires with another to administer, or employs anyone who administers or attempts to administer a forbidden substance to a horse after arrival at a show recognized by this Association without complying with Section (g) herein, shall be subject to the penalties provided in Section (d) herein below.
 (d) The owner or owners of a horse found to have received a forbidden substance may be required to forfeit all prize money or sweepstakes and any trophies, ribbons and "points" won at said show by said horse and the same shall be redistributed accordingly. Points accumulated toward Horse of the Year Awards prior to said show may be nullified and redistributed at the discretion of the Hearing Committee.
 A trainer of a horse found to have received such forbidden substance shall be subject to whatever penalty is assessed by the Hearing Committee and may be fined no more than $1,000.00 and may be suspended from all competition in recognized shows for a period of one year for the first offense, said suspension to be served at any time at the discretion of the Hearing Committee. The horse may be suspended for any period of time specified by the Hearing Committee.
 (e) Horses in competition at a recognized show are subject to examination by a licensed veterinarian who must be appointed by the American Horse Shows Association. Said appointed licensed veterinarian, with the approval of the American Horse Shows Association, may appoint a technician to perform certain duties under this Section of Rule III. The ex-

two months and fined $300.00 for violating this rule.

amination may include physical, saliva, urine, blood tests, including the administration of a drug to induce urination, with the trainer's consent, or, any other test or procedure in the discretion of said licensed veterinarian necessary to effectuate the purposes of this rule. Said veterinarian may examine any or all horses in a class or all classes in a show, or any horse entered in any class whether in competition or not if on the show grounds, or any horse withdrawn by any exhibitor within 24 hours prior to a class for which it has been entered.

Whether a horse is in competition or not, refusal to submit the horse for examination or to cooperate with the veterinarian or his agents shall constitute a violation and subject the responsible person to penalties under (d) above.

A representative of the AHSA, appointed by the Administrator of the Drugs and Medications Committee, upon presentation of proper credentials, may enter the stable, tack room, automobile, van or any other place within the enclosure of a Recognized Show, to inspect or examine the personal effects and property of every trainer, his employees or agents, as defined herein. The trainer is responsible for all these areas. If reserpine, or any drug containing reserpine, is found in any of the locations described above, the trainer responsible for said areas in which said drug is found shall be subject to the penalties provided in Section (e) hereinabove. Bottles suspected to contain reserpine may be removed from the custody of any trainer, his employees or agents, for testing. All trainers defined hereinabove do hereby consent to any action taken under this rule for themselves, their employees and agents, and waive and release the American Horse Shows Association, its officers, Directors and agents, from any and all claims or causes of action by virtue of said actions taken.

(f) Should the chemical analysis of saliva, urine or other samples taken from a horse indicate the presence of a forbidden substance, this shall be prima facie evidence that the forbidden substance has been administered to said horse.

When a positive report is received from the chemist identifying a forbidden substance, a hearing shall be held in conformity with Rule X. No trainer, responsible for the condition of said horse, shall be suspended, or a horse barred, from competition until after the conclusion of said hearing, and, a written ruling thereon has been made.

(g) A horse exhibiting at a Recognized Show that receives any medication which contains a forbidden substance shall not be eligible for competition unless the following requirements have been met and the facts requested are furnished in writing:

The facts surrounding plaintiff's suspension are as follows: In January, 1978, plain-

1. the medication must be therapeutic and necessary for treatment of an illness or injury
2. the horse must be withdrawn from competition for a period of not less than 24 hours after the medication is administered
3. the medication must be administered by a licensed veterinarian, if available, and in his absence only by the trainer
4. identification of medication; the amount, strength and mode of administration
5. date and time of administration
6. identification of horse, its name, age, sex, color and entry number
7. diagnosis and reason for administration
8. statement signed by person administering the medication
9. statement filed with the Steward within one hour after administration or one hour after the Steward returns to duty if administration is at a time other than during show hours
10. statement signed by the Steward and time of receipt recorded on the statement by the Steward.

If the chemical analysis of the sample taken from a horse so treated indicates the presence of a forbidden substance, and all the requirements of this subsection have been fully complied with, the information contained in said medication report and any other relevant evidence shall be considered by the association in determining the guilt or innocence of any person charged under the provisions of this rule.

Failure to follow all the requirements of this subsection is a violation of the rules. Such violations must be reported by the Steward to the association for such further action as may be deemed appropriate.

(h) To provide funds for research, inspection and enforcement of rules regarding use of medication and drugs, each recognized show, except those in California, must assess the exhibitors a fee of $2.00 for each horse entered in the show. The following classes are exempted from payment: 1) equitation, 2) leadline, 3) exhibitions, 4) games and races and 5) classes for 4-H members. Within 10 days after a show, show management shall forward to the Association a sum representing the number of horses entered in the show, such sum to be held by the Association in a separate fund for use in accomplishing the purpose set forth above.

(i) Each recognized show must set aside suitable facilities conveniently located for the veterinarian appointed by the Association to make tests.

American Horse Shows Association Rule III, Part 1, Section 5.

tiff was employed as a trainer of show horses and riders by Hunterdon, Inc., a training facility located in Pittstown, New Jersey. He was retained to train a horse named Gozzi, which participated in the Pine Hill Riding Center Competition in Framingham, Massachusetts, on April 23, 1978. Plaintiff was present at the show, and was responsible for the preparation of Gozzi and his owner-rider, Bonnie Blake, for the competition. Gozzi and his rider won every competition in which they were entered. In accordance with its regular testing program, and with plaintiff's consent, representatives of the AHSA took blood samples from Gozzi for the purpose of determining whether any foreign drugs had been administered. The test indicated that Gozzi had received an injection of reserpine, a prohibited drug which has a tranquilizing effect on the animal.

On May 30, 1978, plaintiff was notified by the AHSA that charges had been filed against him alleging that he had violated the AHSA's Drug Rule.[2] He was informed that a hearing would be scheduled, and that his attorney could represent him at the hearing. The hearing was held on September 27, 1978, but plaintiff's counsel did not attend. At the hearing, evidence was produced that reserpine was present in the blood of Gozzi at the time of the competition. Plaintiff testified that he was present at the competition, and as trainer was responsible for the condition and performance of Gozzi, and further that he knew the rule regarding trainer responsibility. He denied, however, any responsibility for or knowledge of the drugging, and further stated that he had detected no change in the horse's condition that would have alerted him to the drugging.

The day following the hearing, the Hearing Committee, which consisted of five persons, none of whom were active trainers who compete with plaintiff, unanimously decided to suspend and fine the plaintiff. In a letter to plaintiff, the Committee noted that in deciding upon an appropriate penalty it took into account that there was no evidence that plaintiff administered or knew of the administration of the prohibited substance. The letter further states: "The Committee also noted, however, the standard of responsibility required of trainers under the provisions of Rule III, Part 1, Section 5(b) and (c) and that no substantial evidence was introduced at the hearing to indicate that you, as trainer, were not responsible for the condition of the horse "GOZZI" at the Pine Hill Horse Show." Affidavit of Edward S. Bonnie at 5 (filed October 28, 1978).

During the period of plaintiff's suspension, from October 2 to December 2, 1978, the regulations of the AHSA required all sponsors and managers of AHSA recognized horse shows to bar his participation. On October 20, 1978, plaintiff instituted the present action. In his original complaint, plaintiff sought both temporary and preliminary relief enjoining his suspension. The Court denied plaintiff's application for a preliminary injunction, finding that plaintiff failed to make a clear showing of threat of irreparable injury. Memorandum and Order, *Cooney v. American Horse Shows Association, Inc.,* 78 Civ. 4982 (JMC) (filed Oct. 26, 1978).

Thereafter, plaintiff filed an amended complaint in which he seeks declaratory and injunctive relief as well as treble damages. He contends that (1) the AHSA has engaged in a group boycott which is unlawful per se under section one of the Sherman Act; (2) the drug rule standard of liability which holds a trainer liable where there is no evidence that he knew or was involved in the wrongdoing is arbitrary and unreasonable, and thus violates the rule of reason;

---

2. George Morris, the proprietor of Hunterdon and Gozzi's head trainer, Kathleen Moore, who is associated with Hunterdon, and Bonnie Blake were also charged in the drugging incident. These individuals entered into a plea bargain agreement with the AHSA on September 20, 1978. Morris was suspended for three and one-half months and fined $625.00. Bonnie Blake, as owner of the horse, agreed to return all trophies, monies, prizes, and to cancel all points and ribbons won by Gozzi at the Pine Hill Show. The charge against Kathleen Moore was dismissed.

(3) the AHSA has monopolized the horse show industry in the United States in violation of section 2 of the Sherman Act; and (4) the arbitrary and unreasonable suspension violates the common law of the State of New York.

The defendant has moved to dismiss the complaint for failure to state a claim upon which relief can be granted, or alternatively, for summary judgment.

Jurisdiction is based upon the presence of a federal question, 28 U.S.C. § 1331(a), and diversity of citizenship, 28 U.S.C. § 1332(a).

## DISCUSSION

*Section One Claims*

■ It is clear that the AHSA, as a not-for-profit membership organization, may promulgate reasonable rules and regulations to effectuate the purpose for which it was formed, namely, to promote the fairness and integrity of competitions recognized by it. *Molinas v. National Basketball Association*, 190 F.Supp. 241, 244 (S.D.N.Y. 1961). In this respect the AHSA is similar in nature and purpose to other sport associations which seek to regulate competition for the mutual benefit of the competitors and in the hope of continuing public interest in the sport. But even such sport associations, with the exception of major league baseball, are subject to the antitrust laws.

■ Section one of the Sherman Act prohibits only combinations or agreements which unreasonably restrain trade. *Board of Trade of Chicago v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1917); *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Courts have recognized that certain agreements or practices that have a pernicious effect on competition and lack any redeeming quality are conclusively presumed to be unreasonable and thus are illegal per se. *See North-*

*ern Pacific v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1957). Plaintiff contends that his suspension by the AHSA constitutes a "group boycott" or concerted refusal to deal, and is therefore illegal per se. *See Klor's v. Broadway-Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild v. F.T.C.*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

■ The Court concludes, however, that plaintiff's suspension pursuant to the disciplinary rules of the AHSA cannot be characterized as a group boycott—at least not a boycott which has traditionally been considered illegal per se.[3] *Neeld v. National Hockey League*, 594 F.2d 1297 (9th Cir. 1979); *Hatley v. American Quarter Horse Association*, 552 F.2d 646 (5th Cir. 1977). The Second Circuit has indicated that " '[w]hile the boycott concept is infinitely expandable, the per se doctrine ought not to be.' " *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir.), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978) (quoting L. A. Sullivan, Antitrust 256 (1977)). The allegations by plaintiff in his pleadings do not illustrate horizontal restraints which can be characterized as "naked restraints" of trade with no purpose except stifling competition. *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). In the instant case, competitors did not agree to exclude plaintiff from the market of trainers at competitions recognized by the AHSA in order to insulate themselves from competition. Indeed, the AHSA drug rule is designed to improve and foster fair competition at the trainer market level, and does not insulate show competitors, be they trainers, owners or riders, from competition. *See Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1179–82 (D.C.Cir.1978); *North American Soccer League v. National Foot-*

---

**3.** A careful reading of the boycott cases relied upon by plaintiff, *see, e. g., Linseman v. World Hockey Association*, 439 F.Supp. 1315 (D.Conn. 1977); *Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049 (C.D.Cal.1971), shows that the per se rule has been applied only in the face of arguably demonstrable anticompetitive motives or where no provision for a hearing challenging the regulation was made. Moreover, there is an exception from the per se rule for reasonably self-regulated industries. This exception developed from *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

*ball League*, 465 F.Supp. 665, 672–75 (S.D. N.Y.1979).

▮ Therefore, the Court concludes that the rule or reason must be applied to determine whether the AHSA's enforcement of the drug rule unreasonably restrained trade. Under the rule of reason, the Court must evaluate the challenged rule in light of the factual context of the particular industry, the history of the restraint, and the reason for its imposition, *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), in order to determine whether on balance its anticompetitive effects outweigh its procompetitive benefits. *Smith v. Pro Football, Inc., supra*, 593 F.2d at 1183; *Paralegal Institute, Inc. v. American Bar Association*, 475 F.Supp. 1123, 1129

(E.D.N.Y.1979); *North American Soccer League, supra*, 465 F.Supp. at 675. Clearly such disciplinary action can be considered unreasonably anticompetitive in effect only if the regulation is enforced in an arbitrary or discriminatory manner, or where the restraint is broader than reasonably necessary to accomplish the legitimate goal of the regulation.

▮ The record before the Court amply demonstrates the reasonableness of the rule in question.[4] The procompetitive benefits of the rule clearly predominate. Given the conditions at competitions, where owners, riders, trainers and their personnel have access to the horse, enforcement of the drug rule would be all but impossible if the individual who has accepted responsibility for the horse's condition could not be held

---

4. In the context of due process challenges, similar drug regulations in the horse racing industry have been found to be reasonable. In *Barchi v. Sarafan*, 436 F.Supp. 775 (S.D.N.Y.1977), *aff'd in part, rev'd in part*, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), the court reviewed a rule of the New York State Racing and Wagering Board ["NYSRWB"], which created a rebuttable presumption that the trainer is responsible for the drugged condition of his horse. The court found that the standard of liability imposed, which it referred to as the "trainer's insurer" rule, "is reasonably related to the interests involved and, given the rebuttable nature of the [rule's] presumption, the high standard of accountability is not unconstitutional." *Id.* at 784.

The majority of racing commissions now have even stricter regulations which provide that the trainer is the absolute insurer of the horse's condition, and therefore hold him strictly liable for the acts of others. *See Division of Pari-Mutuel Wagering v. Caple*, 362 So.2d 1350 (Fla.1978) and cases cited therein. These regulations do not depend upon the operation of an irrebuttable presumption of trainer responsibility for the drugging, which in the past was held to violate due process, *see Paoli v. Baldwin*, 159 Fla. 165, 31 So.2d 627 (1947), overruled by *Caple, supra; Mahoney v. Byers*, 187 Md. 81, 48 A.2d 600 (1946); rather, courts now uphold these rules on the basis of the state's power to impose strict liability as a reasonable exercise of its regulatory authority over horse racing. Plaintiff argues that the reasonableness test applied to due process challenges of state regulations is less demanding than that required by the application of the rule of reason. While the standard of reasonableness may differ in the above cases, their insight into the problems of

regulating drugging activity in the horse racing industry is equally applicable in the horse show industry, where the reputation of the trainer, as well as the value of the horse and possibly its future offspring are greatly affected by the level of success at competitions.

In evaluating these rules, it has been recognized that:

> . . . Conceding that the rule . . . is harsh and may, in some instances, result in injustice to innocent people, we think the rule can be justified on the grounds of public policy, because it is the only effective means by which fraud and deceit in connection with horse racing can be minimized.

*Division of Pari-Mutuel Wagering v. Caple, supra*, 362 So.2d at 1354 (quoting *State ex rel. Morris v. West Virginia Racing Commission*, 133 W.Va. 179, 55 S.E.2d 263 (1949)). Similarly, the Ohio Court of Appeals noted that:

> Horse racing, at its best, is difficult to control, and would be practically impossible to regulate if every governing rule and regulation was made dependent for validity upon the knowledge or motives of the person charged with a violation.

> . . . . .

> [W]hen viewed in the light of its overall purpose, the business to which it relates, and the potential evil which it is designed to prevent, we cannot say that the rule is unreasonable. Manifestly, it would be almost impossible to prove guilty knowledge or intent in cases of this kind, and the futility of prosecutions under a rule requiring probative evidence of guilty knowledge and intent would eventually leave the public interest and welfare to the mercy of the unscrupulous.

*Fogt v. Ohio State Racing Commission*, 3 Ohio App.2d 423, 426, 210 N.E.2d 730, 733 (1965).

accountable in the absence of substantial evidence that he is not responsible for the drugged condition. *Fogt v. Ohio State Racing Commission*, 3 Ohio App.2d 423, 210 N.E.2d 730 (1965). Contrary to plaintiff's contention, this stringent standard of liability is necessary to accomplish the legitimate goals of the Drug Rule. Otherwise, the trainer could simply escape liability by denying any knowledge of the drugging. The presumption of the trainer's responsibility for the drugging shifts the burden of proof to the trainer, but the rule on its face is rebuttable by substantial evidence that the trainer is not responsible for the drugged condition. In effect, the rule encourages the trainer to exercise a high degree of care and control over the horse, not unlike regulations which punish the trainer's failure to guard his horse. *See, e. g., Maryland Racing Commission v. McGee*, 212 Md. 69, 128 A.2d 419 (1957); *Commonwealth v. Webb*, 1 Pa.Cmwlth. 151, 274 A.2d 261 (1971). In this respect the present standard does not differ greatly from the supposedly less stringent negligence standard that plaintiff advocates. The Hearing Committee recognized at the time it imposed the suspension that no evidence established that plaintiff administered or knew of the administration of the drug. This merely indicates, however, that the Committee believed that the plaintiff had not met the high standard of care created by the drug rule. Plaintiff was aware of this standard of trainer responsibility. He accepted responsibility for the horse's condition, not just for its preparation for the competition. Since he was present and responsible for the horse's condition, he, more than anyone else, was in a position to know exactly who administered the drug. If that person was a subordinate, plaintiff was responsible for that conduct. If that person was a third party, plaintiff, as the person responsible for guarding and controlling the horse, was in the best position to prevent the drugging or discover who in fact did it, and in that way rebut the presumption of his responsibility for the drugging. In any event, the Court finds that plaintiff failed to raise any material factual issues in replying to the defendant's motion,[5] and therefore the Court concludes

**5.** Plaintiff argues that summary judgment is inappropriate where the rule of reason is applied because of alleged material factual issues. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). But even in the antitrust context, where summary judgment is used sparingly, the party opposing the motion must raise one material issue of fact, that is an issue which may affect the outcome of the litigation. *See Neeld v. National Hockey League*, 594 F.2d 1297, 1300 (9th Cir. 1979); *Paralegal Institute, Inc. v. American Bar Association*, 475 F.Supp. 1123 (E.D.N.Y.1979).

In the instant case, many of the alleged factual issues offered by plaintiff are in reality questions of law. Other issues raised were immaterial or unsupported by facts. *Beal v. Lindsay*, 468 F.2d 287, 291 (2d Cir. 1972). First, plaintiff contends that the adequacy of the hearing and the procedural safeguards afforded to him is an issue. The Court considers the adequacy of these procedures to be a question of law, however. After a thorough review of the pre-hearing correspondence submitted to the Court and the transcript of plaintiff's hearing, the Court concludes that these procedures were more than fair and adequate. Similarly, the Court considers plaintiff's contention that the drug rule's presumption of trainer responsibility creates a stricter standard than is necessary to achieve its legitimate goals to be a question of law. The defendant has demonstrated that the widespread use of drugs on horses in competitions is a recognized and widespread problem. *See* Affidavit of James J. Fallon, Exhibit B (filed Oct. 25, 1978). The reasonableness of regulations used to control this problem must be determined by the Court.

Moreover, plaintiff contends that even though the drug rule on its face creates a rebuttable presumption of trainer responsibility, it nevertheless is applied by the AHSA as an irrebuttable presumption once an individual admits that he or she is the trainer of the drugged horse. Plaintiff's Memorandum at 46 (filed April 11, 1979). Even if this were true, however, it is immaterial here, since plaintiff did not present substantial evidence to the hearing committee that he was not responsible for the horse's condition. The only evidence that he presented was his own testimony that he did not administer or know of the administration of the drug. As noted earlier, the drug rule imposes a higher standard of liability than that of mere personal responsibility or knowledge.

Plaintiff's argument that there was substantial evidence before the Committee indicating that a third party, namely George Morris, was responsible for the drugging, is simply inaccurate. In the plea agreement signed by George Morris, he admits no more than that he, on the advice of a veterinarian, authorized the admin-

that defendant is entitled to summary judgment as a matter of law on the section one claims.[6]

## Section Two Claims

 Count II of plaintiff's first amended complaint alleges that the defendant monopolized the horse show industry in the United States in violation of section two of the Sherman Act. The Court recognizes that meaningful participation in the multimillion dollar horse show industry depends on membership in the AHSA. But even a single organization which exercises a dominant position in a given market does not violate section two unless it has "acquired or maintained [its] strategic position, or sought to expand [its] monopoly, or expanded it by means of those restraints of trade which are cognizable under § 1." *United States v. Griffith*, 334 U.S. 100, 106, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948); *accord, Hatley v. American Quarter Horse Association, supra*, 552 F.2d at 654–55; *Deesen v. Professional Golfers' Association of America*, 358 F.2d 165 (9th Cir.), *cert. denied*, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966).

Since the Court finds that the AHSA through its rules and regulations promotes competition rather than restrains it, the defendant is entitled to summary judgment as a matter of law on Count II. *See Paralegal Institute, Inc. v. American Bar Association, supra*, 475 F.Supp. at 1131.

## Common Law Claims

 Plaintiff contends that the common law of the State of New York proscribes the suspension of a member from a membership organization when there is no evidence of the member's knowledge or involvement in the violation. *Lamborn v. New York Cotton Exchange*, 203 App.Div. 565, 197 N.Y.S. 57 (1st Dep't 1922).[7] Even under this interpretation of *Lamborn, supra*, which is inaccurate since the rule in that case proscribed only "conduct" by the member, and not the acts of his employees taken without his knowledge,[8] the Court finds that there was sufficient evidence to sustain plaintiff's suspension under the standard of liability imposed by the drug rule, which the Court has already found to

---

istration of ¼ cc. of reserpine more than 96 hours prior to the Pine Hill Horse Show. At plaintiff's hearing, the chemist testified that that amount of the drug administered 96 hours before the competition could not account for the level of the drug found in the horse's blood sample. Affidavit of Edward S. Bonnie, Exhibit F at 26–27 (filed Oct. 25, 1978). Thus, plaintiff presented no substantial evidence that indicated that he was not responsible for the later drugging, and therefore the outcome of this case would be the same whether the presumption was rebuttable or irrebuttable.

Lastly, plaintiff contends that the defendant's possible anticompetitive motives or intent is a factual issue which renders summary judgment inappropriate in this case. Aside from the conclusory allegations concerning intent contained in plaintiff's brief at 31, 36 (filed April 11, 1979), the plaintiff made no such allegations in his amended complaint, affidavit or Rule 9(g) statement. Furthermore, he did not present any factual material when responding to defendant's motion for summary judgment which even remotely indicates that his suspension or the institution of the drug rule was motivated by an anticompetitive design on the part of the defendant. Thus, plaintiff has not presented an adequate factual basis to raise the issue of possible anticompetitive intent on the part of the defendant.

6. Defendant's contention that plaintiff's pleadings are insufficient since plaintiff did not allege any damage to the public interest is without merit. Allegations that the defendant unreasonably prevented plaintiff from participating in the industry is sufficient. Moreover, the Court finds the amended complaint describes the relevant market with sufficient specificity.

7. The Court declines to abstain from considering plaintiff's state law claims, which are issues cognizable under Article 78 of the Civil Practice Law and Rules (McKinney 1963), *but see Herrmann v. Brooklyn Law School*, 432 F.Supp. 236 (E.D.N.Y.1976); *Ali v. Division of State Athletic Commission*, 308 F.Supp. 11, 19 (S.D.N.Y.1969), since it is clear that plaintiff is not entitled to relief under the common law of New York.

8. Contrary to plaintiff's argument, *Lamborn, supra*, indicates that a membership organization can discipline its members where there is no evidence of their personal responsibility if the rule expressly makes them responsible for the actions of others. *Lamborn, supra*, 203 App.Div. at 569, 197 N.Y.S. at 61; *see Avery v. Moffatt*, 187 Misc. 576, 55 N.Y.S.2d 215 (Sup. Ct.1945).

be necessary and reasonable. His suspension cannot be considered arbitrary or capricious, either in terms of the procedural protections afforded to him or the substantive standard of liability imposed upon him. Therefore, the defendants are entitled to summary judgment as a matter of law on plaintiff's state law claims.

CONCLUSION

Accordingly, the defendant's motion for summary judgment is granted. The Clerk of the Court is directed to prepare and enter a Judgment dismissing the amended complaint. Fed.R.Civ.P. 56.

SO ORDERED.