507 P.2d 426

Johnnie L. JAMISON, Plaintiff-Appellant,

v.

STATE RACING COMMISSION and its members, et al., Defendants-Appellees.

No. 9475.

Supreme Court of New Mexico.

March 9, 1973.

McAtee, Marchiondo & Berry, E. Douglas Latimer, Robert L. Thompson, Albuquerque, for plaintiff-appellant.

David L. Norvell, Atty. Gen., Thomas L. Dunigan, Asst. Atty. Gen., Santa Fe, for defendants-appellees.

## OPINION

OMAN, Justice.

Petitioner is licensed as a horse trainer by the New Mexico State Racing Commission, hereinafter called the Commission. The Board of Stewards of Sunland Park entered an order suspending petitioner from training and racing horses at race tracks within this State. This order was entered after a chemical analysis revealed the presence of the drug Ritalin in the urine of a horse named Texas Sun, which won the fifth race at Sunland Park on April 4, 1971. Petitioner was the trainer of Texas Sun.

Petitioner sought and was granted a hearing by the Commission after the entry of the Stewards' order of suspension. At the conclusion of the hearing, the Commission entered an order suspending petitioner from racing in New Mexico for a period of six months.

Petitioner then sought and was granted by the district court of Santa Fe County a writ of certiorari directed to the Commission. After reviewing the record and hearing arguments, the district court entered judgment affirming the order of the Commission. The case is now before us on appeal from the judgment of the district court. We affirm.

■ Petitioner first contends the trial court erred in not holding rules 15.04 and 15.06 of the Commission "* * * unconstitutional, void and beyond the scope of authority granted * * *" the Commission by the Legislature.

Section 60–6–2, N.M.S.A.1953 (Repl. Vol. 9, pt. 1, 1960) provides in part:

"The New Mexico racing commission shall have the power to grant and/or refuse and revoke licenses; to make rules and regulations for the holding, conducting and operating of all race meets and races held in the state, * * *."

Section 60–6–7, N.M.S.A.1953 (Repl. Vol. 9, pt. 1, 1960) provides in part:

"The state racing commission shall adopt reasonable rules and regulations in writing to the end that all horse races shall be conducted with fairness and that the participants therein and the patrons thereof shall be protected against all wrongful, unlawful or unfair conduct and practices of any and every kind on the grounds where such races are held. * * * Every license issued by said commission shall require the applicant therefor to abide by the rules and regulations promulgated by the commission * * *.

"* * * *

"In the event of any violation of the provisions hereof or of any of the rules and regulations promulgated by the state racing commission the license of the offending applicant may be canceled or revoked at any time by the commission, * * *"

■ The obvious intent of the Legislature was to confer broad powers upon the Commission in order to properly protect the public safety, morals and general welfare in an area of activity wherein potentially dishonest practices and other evils often arise, unless the activity is carefully regulated and controlled. See Ross v. State Racing Commission, 64 N.M. 478, 330 P.2d 701 (1958); Standard "Tote" Inc. v. Ohio State Racing Commission, Ohio Com.Pl., 121 N.E.2d 463 (1954), aff'd, 98 Ohio App. 494, 130 N.E.2d 455 (1954).

Pursuant to its statutory authority and duty, the Commission adopted rules 15.04 and 15.06 which provide:

"15.04 A clear test is required of all horses tested in accordance with these Rules.

"(a) Should the chemical, or other analysis, made by the Official State Chemist, or any chemist approved by the Commission, of a urine, saliva or blood sample, or other tests, taken from a horse entered in a race, prove positive, showing presence of any narcotic, stimu-

lant, depressant, local anesthetic, analgesic, pyrasolodine or any derivative or compound thereof, any other drug, chemical or medicine; the Official State Chemist shall so report in the manner prescribed by the Commission.

"(b) No punitive action shall be taken by the Stewards in matters involving a laboratory test of a specimen of urine, saliva or blood taken from a horse until a report signed by the Official State Chemist has been received by the Stewards and the horse has been properly identified. The Official State Chemist shall send the original and a duplicate signed copy of the report to the Executive Secretary of the Commission who shall immediately mail the duplicate copy to the Stewards.

"(c) Stewards shall not authorize purse payment of a race until the Official State Chemist has made a report on all tests of such race to the Executive Secretary of the Commission who shall instruct Stewards regarding purse releases.

"(d) The Trainer and horses owned or trained by him shall be suspended by the Stewards whose jurisdiction shall not terminate until official laboratory test reports of all races of the Meeting have been received, and the matter shall be referred to the Commission.

"(e) The horse shall be disqualified and the owner shall not participate in the purse distribution unless so ordered by the Commission after Hearing of the case.

"(f) Any track record established by the horse in such race shall be declared null and void.

"(g) The Owner, Trainer, foreman in charge of the horse, the groom, and any other person shown to have had care, or attendance, of the horse, may at the discretion of the Commission have any or all of the following penalties inflicted; be suspended, fined or ruled off.

"(h) Any horse suspended under Positive Test Rule 15.04 shall not be eligible for reinstatement by Stewards or the Commission until the horse is examined by the Track Veterinarian, or a Veterinarian designated by the Commission, and a written report by him is made to the Stewards or Commission stating the horse is in fit condition to race."

"15.06 The Trainer shall be responsible for the condition of the horse he enters."

These rules impose strict accountability upon the trainer for the condition of a horse he enters in a race. If he enters a horse in a race and it is shown by competent analysis to have any of the prohibited substances in its urine, saliva or blood, or is shown by other competent tests to have any such substance in its body, the trainer is strictly liable therefor and is subject to being suspended, fined or ruled off. Proof of guilty intent or knowledge on the part of the trainer of the presence of the substance in the body of the horse, the effect thereof upon the speed or stamina of the horse, or the quantity thereof in the body of the horse, are not required to impose liability upon the trainer. Sanderson v. New Mexico State Racing Commission, 80 N.M. 200, 453 P.2d 370 (1969). See also Sandstrom v. California Horse Racing Board, 31 Cal.2d 401, 189 P.2d 17 (1948), cert. denied, 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369 (1948); State v. West Virginia Racing Commission, 135 W.Va. 512, 63 S.E.2d 831 (1951); State v. West Virginia Racing Commission, 133 W.Va. 179, 55 S.E.2d 263 (1949); Fogt v. Ohio State Racing Commission, 3 Ohio App.2d 423, 210 N.E.2d 730 (1965).

■ Petitioner next urges that the Commission's decision was arbitrary, capricious and unsupported by competent, admissible and substantial evidence. His complaints are that (1) the chain of custody of the urine samples examined by the State Racing Chemist was not sufficiently established, and (2) the urine samples, which were fully consumed in conducting the analyses, were never introduced into evidence, thereby destroying petitioner's rights to cross-examine and to be confronted by the wit-

nesses against him as guaranteed by the Sixth Amendment to the United States Constitution.

The Commission has established regular procedures for the taking and analyzing of urine samples from horses winning races, and these procedures were followed in all details in the case at hand.

As the winner of a race, Texas Sun was taken to the test barn and two samples of his urine were recovered by an assistant to the State Veterinarian at Sunland Park. The horse was identified as Texas Sun by his lip tattoo, and he was the only horse in the stall at the time of the recovery of the urine.

The two samples were placed in plastic sacks and enclosed therewith was a card showing the name of the track and the date. This card was detached from a companion portion thereof and bore a number which was blanked out or obscured from vision by a covering. This covering was removed by the New Mexico State Racing Chemist in Albuquerque to whom the urine samples were shipped on April 4, 1971 by the State Veterinarian at Sunland Park. These samples were shipped in a sealed and locked metal container. No evidence of tampering with the container or the lock was observed by the State Chemist or his assistant. Had any such tampering been noted a record thereof would have been made. The container was picked up from the public carrier by an assistant of the State Chemist and delivered to the laboratory of the chemist. An assistant made tests on one of the samples, which showed the presence of the drug. The chemist then analyzed the other sample which confirmed the presence of the drug. Thereupon the chemist notified the bank to which the companion portion of the card enclosed with the samples had been sent.

This companion portion of the card bore the same number as that portion of the card forwarded to the chemist with the urine samples. This companion portion of the card also showed the name of the track; the date the sample was taken, which was the same date as the race; the name of the horse; the time of arrival of the horse at the test barn; the time the test was completed in the barn; the number of the race and the order in which the horse finished; the name of the owner of the horse; the name of the trainer; the signature of the groom; and the signature of the veterinarian.

The bank matched the portion of the card received from the veterinarian with the portion thereof received from the chemist and then notified the Commission accordingly.

 There is absolutely nothing in the record which casts doubt or suspicion upon the fact that the urine analyzed by the chemist was the urine taken from Texas Sun on April 4, 1971 in accordance with the established procedures. The identity of the urine samples analyzed by the chemist with those taken from Texas Sun was not required to be established beyond all possibility. All that was required was the establishment of the identity to a reasonable certainty. Patterson v. State, 224 Ga. 197, 160 S.E.2d 815 (1968); cf. State v. Coburn, 82 Idaho 437, 354 P.2d 751 (1960); Bean v. Riddle, 423 S.W.2d 709 (Mo.1968); State v. Belcher, 83 N.M. 130, 489 P.2d 410 (Ct.App.1971); State v. Harrison, 81 N.M. 623, 471 P.2d 193 (Ct.App. 1970); State v. Gray, 79 N.M. 424, 444 P.2d 609 (Ct.App.1968); State v. Sweat, 78 N.M. 512, 433 P.2d 229 (Ct.App.1967).

This Court is in the process of adopting "New Mexico Rules of Evidence" for the purpose of bringing about a greater degree of uniformity in our Rules of Evidence as well as in their understanding and application to tenders of evidence at trial. One of these proposed rules, which has been approved by this Court and which is here applicable, provides that the following are not excluded by the hearsay rule:

"A memorandum, report, record, or data compilation, in any form, of acts,

events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, all in the course of a regularly conducted activity, as shown by the testimony of the custodian or other qualified witness, unless the sources of information or other circumstances indicate lack of trustworthiness."

Rule 803(6) proposed New Mexico Rules of Evidence.

As above stated, the Commission has established a regular course of procedures governing the regularly conducted activity of examining the bodies of winning horses for the presence of drugs; these procedures were followed in this case; all reports and records prepared in connection with the taking of urine samples from Texas Sun and their subsequent analysis clearly indicate the identity of these samples throughout the entire course of these procedures; and there is neither information nor circumstances shown or suggested in the record which indicate any lack of trustworthiness in the procedures followed or in the identity of the samples.

■ There is likewise no merit to petitioner's contention that because the urine samples were fully consumed in conducting the analyses thereof, and the plastic bags in which they were transported from the veterinarian to the chemist were discarded, petitioner was denied his rights to cross-examine and to be confronted by the witnesses against him. He was granted and exercised at great length his right to cross-examine the Commission's witnesses, including the veterinarian and chemist. He was entitled to no more. State v. Barton, 79 N.M. 70, 439 P.2d 719 (1968); 5 Wigmore on Evidence § 1385 at 79 (3d Ed. 1940).

The judgment should be affirmed.

It is so ordered.

McMANUS and MARTINEZ, JJ., concur.