763 P.2d 66

Brooks CLARIDGE, et al.,
Petitioners–Appellants and
Cross–Defendants,

v.

NEW MEXICO STATE RACING COM-
MISSION, Respondent–Appellee and
Cross–Appellant.

Richard HILL, et al., Petitioners–Appel-
lants and Cross–Defendants,

v.

NEW MEXICO STATE RACING COM-
MISSION, Respondent–Appellee and
Cross–Appellant.

NEW MEXICO STATE RACING
COMMISSION, Petitioner,

v.

Honorable Martin G. PEARL,
Respondent.

Nos. 10,646, 10,633 and 10,647.

Court of Appeals of New Mexico.

June 22, 1988.

Certiorari Denied July 25, 1988.

Joseph Shattuck, Santa Fe, Les Houston, Diane Houston, Murray Giles, Houston & Houston, P.A., Ray Twohig, Ray Twohig, P.C., Charles W. Daniels, Freedman, Boyd & Daniels, P.A., Albuquerque, for petitioners-appellants and cross-defendants.

Hal Stratton, Atty. Gen., Jeff McElroy, Asst. Atty. Gen., Santa Fe, Kathleen Davison Lebeck, Kathleen Schaechterle, Sp. Asst. Attys. Gen., Civerolo, Hansen & Wolf, P.A., Albuquerque, for respondent-appellee and cross-appellant.

## OPINION

ALARID, Judge.

This appeal involves the resolution of conflicting decisions of two different district courts concerning similar issues. In *Hill, et al. v. New Mexico State Racing Comm'n*, No. 10,633, the district court of Valencia County issued a preliminary injunction restraining the New Mexico State Racing Commission (Commission) from using, for evidentiary purposes, the results of racehorse drug tests conducted in laboratories located outside the State of New Mexico or tests which were conducted retroactively after the state racing chemist had certified that initial tests were free from unlawful substances and the purses were distributed. In *Claridge, et al. v. New Mexico State Racing Comm'n*, No. 10,646, the district court of Santa Fe County upheld the Commission's suspension of the licenses of five individuals, following review by certiorari of the order of the Commission.

Appeals in both cases were taken to the Supreme Court. That court, in separate orders entered May 23, 1988, directed that the cases be consolidated and remanded to the Court of Appeals for decision within thirty days. The two cases remanded to this court have also been consolidated by the Court of Appeals with an interlocutory appeal, No. 10,647, involving common issues pending in this court.

Under this court's order dated May 24, 1988, petitioners in Cause Nos. 10,646 and 10,633, and respondent in Cause No. 10,647 were designated as appellants in these consolidated cases, and petitioners in No. 10,647 were designated as appellees and cross-appellants for purposes of these consolidated appeals.

ISSUES

Five issues are raised by the parties in the appeal and cross-appeal: (1) propriety of out-of-state drug testing; (2) legality of drug retesting; (3) ascertainment of legislative intent; (4) administrative interpretation; and (5) as to the five individuals involved in *Claridge*, whether chain of custody of test samples was properly established, whether urine specimens were improperly removed from the New Mexico State Scientific Laboratory (NMSSL), and whether other urine specimens were improperly used to obtain evidence against these individuals.

We affirm the decision of the District Court of Santa Fe County in Cause No. 10,646, and reverse and remand the decision of the Valencia County District Court in Cause Nos. 10,633 and 10,647.

FACTS

Appellants (Horsemen) in this case, petitioners below, are owners, trainers or vet-

erinarians of horses raced in New Mexico during 1987. By statute, they are required to be licensed by the New Mexico State Racing Commission (Commission). NMSA 1978, § 60–1–5(A) (Cum.Supp.1987). All of the Horsemen were so licensed until the events described below. Some of the Horsemen have had their licenses suspended by the Commission after a formal hearing in which the Commission determined the urine specimens of horses they trained tested positive for drugs. The licenses of the other Horsemen have been summarily suspended as a result of positive tests on urine specimens of their horses, but they have not yet had formal hearings before the Commission. We understand that, as a result of proceedings below, the licenses of all the Horsemen have been reinstated pending the outcome of this appeal.

Appellee is the New Mexico State Racing Commission. The Commission is an administrative agency created by statute, NMSA 1978, Section 60–1–3 (Repl.Pamp.1981), .with statutory power to regulate and control horse racing in this state. Included within its statutory powers are the powers to grant and revoke licenses to persons involved in horse racing, Section 60–1–3(F)(1), to make rules and regulations for the conduct of races, Section 60–1–3(F)(2), and to cancel or revoke the license of any license holder who violates the provisions of the Horse Racing Act, or the rules and regulations promulgated by the Commission. § 60–1–11(E) (Repl.Pamp.1981).

The factual setting of this appeal involves post-race testing of racehorses for drugs and other chemicals. After a race, the winning horse and other randomly selected horses are taken to the test barn and specimens of blood, saliva and urine are taken from them. This case particularly concerns the urine specimens. By statute, when there is enough of the urine, it is divided into two portions. *See* NMSA 1978, § 60–1–22 (Repl.Pamp.1981). One of the portions is used for the official tests that are conducted prior to the release of the purse, which we refer to as the official specimen. The second portion is sent to the NMSSL, where it is to be kept for at least three months and, after ten days from receipt, also is to be used in a program of random testing, which we refer to as the NMSSL specimen or the "split" specimen. In addition, the NMSSL specimen, upon demand, is made available to the New Mexico Horsemen's Association.

In August 1987, the Commission began sending official specimens to a laboratory in Arizona, Analytical Technologies, Inc. (ATI), for testing. Also in August 1987, the Commission named Dr. Loris Hughes, Director of the NMSSL, the official state racing chemist. It is apparently undisputed that prior to August 1987 all official testing had been done under the supervision of the official state racing chemist (official chemist) in his laboratory, which was located in New Mexico.

Thereafter, the Commission heard of a new screening procedure that had been developed to detect the presence of two synthetic narcotics, buprenorphine and oxymorphone. As a pilot project, the Commission decided to test this new process by sending NMSSL specimens to Illinois for screening. In addition, the Commission ordered ATI to save specimens even after an official clear test so that they could be screened. Three hundred ninety-four specimens were sent to Illinois, eighteen of which tested possible positive. These eighteen specimens were returned to ATI for testing on the gas chromatograph mass spectrometer (GC/MS), a very expensive but reliable test that identifies the chemicals in a specimen. The GC/MS confirmed the presence of one of the two drugs in nine of the specimens. It should be emphasized that none of the test results from this pilot project have been used in evidence against any of the Horsemen in the two actions below.

The record supports an inference that, as a result of this pilot project, the Commission determined to test all the official specimens held at ATI for the presence of these synthetic narcotics. The Commission developed a priority system for such testing. The top priority was given to those specimens from horses whose specimens had tested positive for these synthetic narcotics during the pilot project. The Commission

identified the horses' trainers through the use of sealed envelopes identifying the horse and trainer connected with each specimen. ATI identified another fifty-four specimens from horses trained by the same trainers. These fifty-four specimens were shipped by Federal Express to a laboratory in Michigan for screening. The Michigan laboratory identified ten as possible positives. These possible positive specimens were shipped back to ATI, which again used the GC/MS equipment to confirm the presence of one of the two drugs in six specimens. The six specimens were from horses trained by five different men: Brooks Claridge, Jimmy Claridge, Richard Fry, Bobby Willis and M. Brent Davidson (the Claridge group). The report from ATI was sent to the official state racing chemist, Dr. Hughes, who reviewed it with Dr. Standifer, head of the toxicology bureau of NMSSL. After verifying the techniques used, the back-up data provided and the results of the tests, Dr. Hughes submitted a report to the Commission. The Commission immediately suspended the licenses of the five trainers, and notified them of formal disciplinary hearings. As a result of the formal hearings, the Commission suspended the licenses of all five men for five years, as required by statute. *See* NMSA 1978, § 60–1–5(F) (Cum.Supp.1987).

The Claridge group immediately filed a petition for writ of certiorari in the Santa Fe County District Court to review the action of the Commission. They argued the Commission's actions violated state statutes prohibiting out-of-state testing and retesting of official specimens once a clear test has been obtained. In addition, they argued the results of the tests could not lawfully be considered by the Commission because the chain of custody of the specimens was not established; because the Commission used confidential records to identify them; and, because the Commission mishandled the split specimens sent to the NMSSL. On March 28, 1988, the Santa Fe County District Court determined that the Commission's actions were within its lawful authority and that its decision was lawful and reasonable, and supported by substantial evidence. The district court therefore upheld the suspensions.

The tests resulting in the suspensions of the Claridge group were only the first round of a series of retests conducted in essentially the same manner. Additional testing identified other specimens containing prohibited drugs, and others were summarily suspended and notified of formal hearings. A second group, Richard Hill and others (the Hill group), thus became involved in litigation. This group initially tried to intervene in the proceedings in Santa Fe; however, when intervention was denied, this group elected to participate as amici in Santa Fe, and filed an independent action for declaratory and injunctive relief in Valencia County. In Valencia County, the Hill group immediately moved for preliminary relief, declaring the out-of-state testing and the retesting for punitive purposes to be a violation of state statutes, enjoining the Commission from conducting further such tests, and prohibiting the use of the results of such tests in disciplinary proceedings against them. After three days of hearings, Judge Mayo Boucher of the Valencia County District Court appointed former district court judge Frank Allen, Jr. as special master to hear evidence and make findings of fact and conclusions of law in the case. The special master heard an additional three days of testimony, and filed his findings of fact and conclusions of law. In regard to the Hill group's claim that the Commission was operating in violation of statute, the special master concluded the statutes in question were not ambiguous and did not prohibit out-of-state testing of official specimens, or retesting after an official clear test. Without granting or denying the motion for preliminary injunction, Judge Boucher recused himself on April 11, 1988. Judge Martin A. Pearl was subsequently appointed replacement judge.

The Hill group objected to the findings and conclusions, and a hearing was held on the objections. On May 6, 1988, the Valencia County District Court (Judge Pearl) declined to adopt the special master's conclusions of law. Instead, Judge Pearl concluded the statutes in question were ambiguous, and made additional findings concern-

ing the intent of the legislature. Judge Pearl concluded both out-of-state testing and retesting violated state statutes, and issued a preliminary injunction enjoining the Commission from taking action against the Hill group's licenses on the basis of such tests. The Commission filed a timely application for interlocutory appeal in this court, and a petition for extraordinary writ of superintending control and alternative writ by emergency relief in the Supreme Court. The Supreme Court denied both petitions and entered an order directing this Court to accept the application for interlocutory appeal, consolidate the case with the appeal of the Santa Fe case, and decide the matter within thirty days. Upon receipt of this order, this Court designated plaintiffs in both cases below appellants in this court, and set appropriate deadlines for submission of the records and briefs of the parties.

## I. OUT–OF–STATE TESTING

In each of the cases before us, the Horsemen argued below and on appeal that out-of-state testing of official specimens is prohibited by NMSA 1978, Section 60–1–13 (Repl.Pamp.1981). The statute reads as follows:

Official state racing chemist; qualification; duties.

The racing commission shall designate one or more "official state racing chemist." An official state racing chemist shall hold a doctorate degree in chemistry or a related field and shall be knowledgeable and experienced in the techniques used for testing the blood, urine and saliva of horses for drugs, dope, chemical agents, stimulants and depressants. He may be either an employee of a private laboratory located in New Mexico or an employee of an agency of the state of New Mexico. He shall exercise those duties as prescribed by the rules and regulations of the commission.

The Horsemen argue the second sentence of the statute, which requires the chemist be, "either an employee of a private laboratory located in the state of New Mexico or an employee of an agency of the state of New Mexico," requires the chemist to per-

sonally conduct the tests of specimens in his laboratory in the state of New Mexico. At the outset, we note that courts in other states interpreting different state statutes have upheld the right of Racing Commissions to conduct out-of-state testing to detect illicit use of drugs in horse races. *See Martinez v. State Racing Comm'n,* 10 Mass.App. 909, 410 N.E.2d 740 (Ct.App. 1980); *Vitale v. State Racing Comm'n,* 13 Mass.App. 1025, 433 N.E.2d 914 (Ct.App. 1982); *DeGroot v. Arizona Racing Comm'n,* 141 Ariz. 331, 686 P.2d 1301 (App.1984).

It is well settled law in this state that statutes are to be given effect as written, and the words in them given their plain and ordinary meaning. *Vaughn v. State Taxation and Revenue Dep't,* 98 N.M. 362, 648 P.2d 820 (Ct.App.1982). Where the meaning of statutory language is plain, there is no reason for construction and the statute must be enforced as written. *Storey v. University of N.M. Hosp./BCMC,* 105 N.M. 205, 730 P.2d 1187 (1986); *State v. Elliott,* 89 N.M. 756, 557 P.2d 1105 (1977). Whether a statute is ambiguous is a matter of law for the court to decide. *N.M. State Bd. of Educ. v. Board of Educ. of Alamogordo, Public School Dist. No. 1,* 95 N.M. 588, 624 P.2d 530 (1981). The Horsemen argue that the intention of the legislature, as indicated from the language of Sections 60–1–13 and 60–1–22, was only to permit in-state testing for illegal drugs given to racehorses and to prohibit evidence concerning the results of drug testing of racehorses obtained after the official state chemist has certified the results of testing and the purses have been distributed. In furtherance of their argument, the Horsemen point to the language of Sections 60–1–13 and 60–1–22. Specifically they assert that the wording of 60–1–22 that "[t]he results of all such tests performed by the laboratory under this section shall ... have no evidentiary value in any hearing before the commission" indicates a legislative intent to preclude both out-of-state testing and drug testing after distribution of the racing purses. We do not read the statute so narrowly. Our reading of the statute

and discernment of the legislative history does not lead to this result. Section 60–1–22, including the language relied upon by the Horsemen, limits the use of evidence derived from random testing by the NMSSL on unused split urine samples.

Reading the Horse Racing Act, Sections 60–1–1 through 60–1–23, as a whole indicates that the legislative purpose was primarily twofold: (1) to authorize commercial horse racing in New Mexico under careful regulation and licensing and in such a manner to ensure that horse racing is fairly and honestly conducted; and (2) to promote and improve the quality of horse breeding in this state. *See* § 60–1–18.

■ The Horse Racing Act clearly proscribes acts by individuals intended to influence or predetermine the outcome of horse racing, or involving the administering of drugs or chemicals. §§ 60–1–13; 60–1–20; 60–1–21; 60–1–22. In discerning legislative intent, we examine the act in its entirety, reading all parts of the act together. *General Motors Acceptance Corp. v. Anaya,* 103 N.M. 72, 703 P.2d 169 (1985); *State ex rel. Newsome v. Alarid,* 90 N.M. 790, 568 P.2d 1236 (1977). Viewed in this manner, we cannot conclude that the legislative intent was to prohibit out-of-state testing for illegal substances used to influence the outcome of state licensed horse racing. A statute should be interpreted to mean that which the legislature intended and to accomplish the end sought. *State ex rel. Newsome v. Alarid.*

The last sentence of the statute provides for the Commission to determine the duties and responsibilities of the chemist. The statute speaks only to the qualifications of the person chosen as official chemist; it does not deal with the issue of who will perform the actual tests or where they will be performed. The Horsemen's interpretation would require we ignore or modify the last sentence, rendering it surplusage. This we cannot do. *See Vaughn v. State Tax. & Rev. Dep't.*

The Horsemen argue the language in Section 60–1–13 requiring the official chemist to be either an employee of a private laboratory located in New Mexico or an employee of an agency of the state of New Mexico is meaningless if the statute is not interpreted to require the official chemist to perform or supervise the tests. We disagree. The record here illustrates that there are other important roles the official chemist can play for the Commission, such as advising it of new developments in testing for drugs, and advising it of the criteria a professional laboratory should meet. Section 60–1–13 allows the Commission to determine the primary duties and role of the official chemist.

The Horsemen attempt to bolster their argument by citing Section 60–1–22, which contemplates testing by the Commission or its "designated agent." The Horsemen argue that because the two statutes are on the same general subject matter, they must be read in pari materia, giving effect to the provisions of each. They also argue that Section 60–1–22 contemplates the designated agent will be the official chemist. If the legislature had meant to require that the designated agent be the state chemist, it would not have used two different terms. *See Vaughn v. State Taxation and Revenue Dep't; contra New Mexico Pharmaceutical Ass'n v. State,* 106 N.M. 73, 738 P.2d 1318 (1987). Reading the Horse Racing Act as a whole, and after examining the legislative intent, we conclude that the Commission has the authority to designate an agent to perform the tests, and does not restrict the Commission's choice in the matter. We do not read Section 60–1–22 or other provisions of the Act to require that the official chemist perform the official tests or that he directly supervise all tests to detect whether illegal drugs have been administered to a racehorse.

Moreover, our Supreme Court has previously held that the Racing Commission, in carrying out the powers invested in it under the Horse Racing Act, possesses the implied power to exercise reasonable discretion in performing its statutory functions. *See Ross v. State Racing Comm'n,* 64 N.M. 478, 330 P.2d 701 (1958). Similarly, in *Sanderson v. New Mexico State Racing Comm'n,* 80 N.M. 200, 453 P.2d 370 (1969), the Court recognized that a license

to act as a trainer is a privilege and not a right and strict liability may be imposed by the state as a right to participate in horse races or to hold a license to do so. *See also State Racing Comm'n v. McManus,* 82 N.M. 108, 476 P.2d 767 (1970); *see generally* Annotation, *Disciplinary Proceedings Against Horse Trainers or Jockeys* 52 A.L.R.3d 206 (1973).

## II. RETESTING OF SPECIMENS AFTER AN OFFICIAL CLEAR TEST

■ In each of the cases before us, the Horsemen argue that the Act, and specifically Section 60-1-22 prohibits retesting of specimens after a clear official test has been had and the purse for the race released. We note resolution of this issue does not affect appellants Hill, Cascio, Burrelsmith and Zarges, who were suspended on the basis of official tests prior to the distribution of the purses. Section 60-1-22 reads as follows:

Testing specimens; forwarding to the health and social services department [health and environment department].

The commission shall adopt rules and regulations for the testing of urine and other specimens taken from such racehorses as are designated by the commission. Provided that a sufficient amount of specimen is available, each specimen taken from a racehorse shall be divided into two or more portions. One portion shall be tested by the commission or its designated agent in order to detect the presence of any drug, dope, chemical agent, stimulant or depressant. A second portion shall be forwarded by the commission to the scientific laboratory system of the health and social services department [health and environment department]. After a questionable, cloudy or positive test result on the portion tested by the commission or its designated agent and upon the written request of the president or manager of the New Mexico horsemen's association on forms prepared and approved by the commission, the scientific laboratory system shall transmit the corresponding second portion to the New Mexico horsemen's association. The scientific laboratory

system shall keep all other specimens in a safe place for a period of at least three months and shall, after the expiration of at least ten days from the date of receipt, perform random tests on the specimens in order to detect the presence of any drug, dope, chemical agent, stimulant or depressant. The results of all such tests performed by the laboratory under this section shall be transmitted immediately by the laboratory to the commission, but they shall have no evidentiary value in any hearing before the commission.

The Horsemen argue the last sentence prohibits retesting of official specimens and use of the results of the retests in disciplinary hearings. As observed above, the Horse Racing Act, viewed in its entirety, does not indicate a legislative intent to restrict the Commission from retesting for the improper use of drugs, and the use of test results as evidence, so long as the testing is carried out uniformly and not in a random manner. Section 60-1-22 by its terms contemplates two types of testing: official testing after the race, and random testing later by the NMSSL. The last sentence of the statute clearly refers only to the tests performed by the NMSSL. To read it any other way would result in a prohibition on use in evidence of the results of both official tests and independent tests by the Horsemen on the NMSSL specimen, and lead to an absurd result. This court must avoid absurd results in construing statutes. *See City of Las Cruces v. Garcia,* 102 N.M. 25, 690 P.2d 1019 (1984). Nothing in this statute prohibits additional tests on the official specimen.

## III. LEGISLATIVE INTENT

In reference to both these statutes, the Horsemen relied below in the Valencia County District Court and on appeal here on documents and testimony they argue demonstrate the legislative history of the statutes and the intent of the legislature in enacting them. The Horsemen rely in particular on documents and testimony from former State Representative George Fettinger, sponsor of the bills that became Sections 60-1-13 and 60-1-22, concerning

his intent in introducing the bills, the manner in which he interpreted them, and various changes made during the course of the session in which they were enacted. In addition, the Horsemen submitted and rely on the testimony of Thomas L. Dunigan, counsel to the Commission in 1975 when the statute was enacted, concerning his concerns about some of the language in the bill that became Section 60–1–22 and proposals he made that were adopted by Fettinger to change certain language.

We agree that the language of Sections 60–1–13 and 60–1–22 is not clear and unambiguous, and that resorting to determination of legislative intent of the Horse Racing Act was proper. Not all of the testimony and evidence presented on this aspect, however, was proper.

■ The Valencia County District Court found as fact the legislative intent of Section 60–1–13 was to require testing of specimens from race horses for punitive purposes be conducted in laboratories located in New Mexico and be actively supervised by the official chemist. In addition, the Valencia County District Court found as fact the evidence establishes that a primary purpose of Section 60–1–22 was to prevent retesting of specimens from race horses for punitive purposes after the official test had been reported to the Commission and the purse released as a result thereof. We note that legislative intent is an issue of law, not fact. *Madrid v. University of California*, 105 N.M. 715, 737 P.2d 74 (1987); *Pan Am. Petroleum Corp. v. El Paso Natural Gas Co.*, 77 N.M. 481, 424 P.2d 397 (1966). On appeal, this court may properly treat these findings of fact as conclusions of law. *See Edens v. N.M. Health and Social Serv. Dep't*, 89 N.M. 60, 547 P.2d 65 (1976). It is well settled in New Mexico that the intent of the legislature is determined primarily from the language of the statute. *First Nat'l Bank of Santa Fe v. Southwest Yacht & Marine Supply Corp.*, 101 N.M. 431, 684 P.2d 517 (1984); *U.S. Brewers Ass'n, Inc. v. Director of the N.M. Dep't of Alcoholic Beverage Control*, 100 N.M. 216, 668 P.2d 1093 (1983), *appeal dismissed* 465 U.S. 1093, 104

S.Ct. 1581, 80 L.Ed.2d 115 (1984); *Arnold v. State*, 94 N.M. 381, 610 P.2d 1210 (1980); *Vaughn v. State Taxation and Revenue Dep't*. Yet an appellate court may also consider the history and background of the statute in question. *First Nat'l Bank of Santa Fe v. Southwest Yacht & Marine Supply Corp.; Methola v. County of Eddy*, 95 N.M. 329, 622 P.2d 234 (1980).

■ However, the Supreme Court has specifically disapproved of the use of the testimony of legislators concerning the intent of the legislature. In *United States Brewers Ass'n*, plaintiffs brought in affidavits from various legislators, chairs of legislative committees, stating they did not know the effect of the legislation in question, and had they known it, they would have held hearings on it. The Supreme Court rejected this evidence as the statements of legislators made after the hearing, holding it was not competent evidence to determine the intent of the legislative body. In so holding, the Court quoted with approval from *Haynes v. Caporal*, 571 P.2d 430, 434 (Okla.1977), as follows:

At trial, legislative intent * * * was sought to be established through the testimony of an individual senator and house member at the time of [the bill's] passage. *This court is not bound, and need not consider such evidence. Testimony of individual legislators or others as to happenings in the Legislature is incompetent, since that body speaks solely through its concerted action as shown by its vote.*

100 N.M. at 218, 668 P.2d 1093 (emphasis added when quoted by supreme court). In addition, the supreme court specifically approved the reasoning and holding of this court in *State v. Turley*, 96 N.M. 592, 633 P.2d 700 (Ct.App.1980), *rev'd* 96 N.M. 579, 633 P.2d 687 (1981). This court's rationale in *Turley* was based not only on the principle that the legislature speaks through concerted action, but also on the reluctance of courts to become involved in judging the credibility of legislators concerning their official actions.

We believe it is clear that under the rationale of *United States Brewers Ass'n*

and the rationale and holding of this court in *Turley,* the testimony introduced by the Horsemen in the Valencia County District Court is not competent on the issue of legislative intent. As observed in *United States Brewers Ass'n,* to determine legislative intent, it is proper to look to the legislative history of an act or contemporaneous statements of legislators during the legislative process. Statements of legislators or other persons, however, made after the passage of the legislation, are generally not considered competent evidence to determine the intent of the legislative body enacting a measure. *See also Duffy v. Las Cruces Public Schools,* 557 F.Supp. 1013 (D.C.N.M.1983).

## IV. ADMINISTRATIVE INTERPRETATION

■ In addition to testimony concerning the intent of the sponsor of the bill in introducing it and the Commission's counsel in seeking to have it amended, the Horsemen introduced testimony below concerning the interpretation of the law by prior commissions. The Valencia County District Court found as fact the long-standing administrative interpretation of the statutes was to prohibit out-of-state testing and retesting after an official clear test. The Horsemen rely on *Molycorp, Inc. v. State Corp. Comm'n,* 95 N.M. 613, 624 P.2d 1010 (1981), for the proposition that this long-standing practice is entitled to persuasive weight. *Molycorp* held that persuasive weight is given an administrative practice when the courts are construing a doubtful or uncertain statute. Nothing in *Molycorp* requires this Court to ignore the language of the statute because the administrative practice has been otherwise. Moreover, the Commission argues that nothing in its official minutes or records indicates that the Commission ever adopted such interpretation as its official policy. Interpretations of a statute by an administrative agency are not binding on the courts, and a reviewing court will overturn a clearly incorrect administrative interpretation. *N.M. Pharmaceutical Ass'n v. State.*

## V. ISSUES RELATING SOLELY TO THE CLARIDGE GROUP

The Claridge group attacks the formal proceedings before the Commission on three grounds: A) the test results were improperly admitted because the Commission failed to establish a proper chain of custody of the urine specimens; B) the NMSSL specimens were improperly removed from the NMSSL by Commission staff without the permission of the Horsemen; and C) the NMSSL specimens were improperly used to obtain evidence against the Horsemen.

### A. *Chain of Custody*

■ In order to admit the test results into evidence, the Commission was required to establish the identity of the urine specimens with reasonable certainty. *Jamison v. State Racing Comm'n,* 84 N.M. 679, 507 P.2d 426 (1973). This determination is left to the trial court, and is subject to review only for abuse of discretion. *State v. Chavez,* 84 N.M. 760, 508 P.2d 30 (Ct.App.1973). It is not necessary to establish every link in the chain, nor does conflicting testimony render the evidence inadmissible. *Id.*

We find no such abuse by Judge Kaufman in the hearing below. Judge Kaufman concluded that the Claridge group did not raise a sufficient question as to the reasonable identity of the samples used to put that issue fairly in contention before the district court. He further concluded that in spite of the errors and omissions that occurred, the court could not find any material prejudice or adequate challenge to reverse the Commission. We conclude that the district court's decision is supported by substantial evidence. *See Duke City Lumber Co. v. N.M. Environmental Improvement Bd.,* 101 N.M. 291, 681 P.2d 717 (1984).

The evidence before the Commission was that the specimens were drawn from the horses in the test barn and placed in sealed containers. The container is a double plastic bag. The specimen is placed in the inner bag, and a card with identification numbers is placed between the inner and

outer bag, and both bags are sealed with a metal seal. The identification numbers are covered with an opaque coating that must be removed in order to see the numbers. The bag cannot be opened without destroying the entire container. The specimens were then sent to Arizona for testing, where they were kept in a locked freezer in the laboratory where the testing was done. The only people with access to this laboratory were the six chemists who used it; other chemists were allowed into the laboratory only if one of the six were there; and the public was not allowed into the laboratory at all. The specimens were shipped to Michigan, then back to Arizona for retesting.

The Claridge group complains that the chain of custody was not developed in sufficient detail to exclude the possibility of tampering. The Commission was not required to find the chain was established in sufficient detail to exclude all possibility of tampering. *See Jamison v. State Racing Comm'n; State v. Chavez; South v. Lucero,* 92 N.M. 798, 595 P.2d 768 (Ct.App. 1979); *see also DeGroot v. Ariz. Racing Comm'n.* Moreover, the testimony before the Commission included testimony from Dr. Hughes that the concentration of chemical in the specimens made it highly unlikely that any of the specimens had been tampered with by a subsequent injection of drugs. We hold that, on these facts, the Commission did not err in admitting the test results of the specimens.

Similarly, the Claridge group argues the Commission relied too heavily on the presumption of regularity that attends the acts of officials, *see Jamison v. State Racing Comm'n,* and that this presumption should not apply because the Commission used extraordinary procedures. The Claridge group is mistaken in its characterization of the Commission's ruling. The Commission's ruling was based on evidence, including documents from the laboratory showing the numbers, testimony concerning the way the specimens were handled, judicial notice of how the cards were handled, the way the specimens were sealed, and Dr. Hughes' testimony indicating no tampering had taken place. The

admission of evidence by the Commission is subject to the discretion of the administrative body and its ruling will not be set aside absent a showing of a clear abuse of discretion. *See Matter of Miller,* 88 N.M. 492, 542 P.2d 1182 (Ct.App.1975).

B. *Removal of NMSSL Specimens from the NMSSL by the Commission Staff*

▉ Some time prior to the receipt of the final report from Arizona on the specimens belonging to horses trained by these trainers, staff investigators from the Commission went to the NMSSL, found the specimens corresponding to the official specimens, and took them to the Commission offices, where they remained until counsel for the Commission instructed the staff to return the samples to the NMSSL. The Horsemen argue that this is a violation of the statute concerning the custody of NMSSL specimens, and therefore the decision of the Commission is void. They rely on *Foster v. Board of Dentistry,* 103 N.M. 776, 714 P.2d 580 (1986); *La Jara Land Developers, Inc. v. Bernalillo County Assessor,* 97 N.M. 318, 639 P.2d 605 (Ct.App. 1982); and *State v. Joyce,* 94 N.M. 618, 614 P.2d 30 (Ct.App.1980).

The Claridge group misreads these cases. In *Foster,* the Supreme Court held the statutory period within which the board was required to decide the case was jurisdictional, and once it passed, the board lost jurisdiction. This decision was recently reaffirmed. *Lopez v. N.M. Bd. of Medical Examiners,* 107 N.M. 145, 754 P.2d 522 (1988). In *La Jara,* this court held a tax assessment void because the county assessor failed to use the method required by statute to value the property. In *Joyce,* this court held a policy was not effective until filed in accordance with the State Rules Act. All of these cases involved violations of statutes directly bearing on the issues before the board in question.

The alleged violation here concerns a collateral matter not directly at issue before the Commission. None of these cases requires or justifies overturning an administrative agency's decision to admit evidence

on the basis of an alleged violation of a statute not related to the evidence admitted.

### C. *Use of the NMSSL Specimens to Identify Trainers*

The Claridge group argues the use of the NMSSL specimens to identify specimens that would have the highest priority on testing was an attempt by the Commission to do indirectly what it could not do directly, or, in other words, to use the NMSSL specimens in evidence. The NMSSL specimens were not, however, used in evidence, and thus the statutory prohibition against use of the results of the NMSSL tests in evidence was not violated.

### CONCLUSION

For the reasons discussed above, we affirm the judgment of the Santa Fe County District Court, upholding the Commission's decision to suspend the licenses of the Claridge group. We reverse the judgment of the District Court of Valencia County, order that the preliminary injunction issued by that court be vacated, and remand for further proceedings consistent with this opinion. No costs are awarded.

IT IS SO ORDERED.

DONNELLY, C.J., and MINZNER, J., concur.