This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-38315**

**NEW MEXICO ENVIRONMENT
DEPARTMENT, OCCUPATIONAL
HEALTH AND SAFETY BUREAU,**

 Appellant-Respondent,

v.

**NEW MEXICO OCCUPATIONAL
HEALTH AND SAFETY REVIEW
COMMISSION,**

 Appellee,

and

**MCCARTHY BUILDING COMPANIES
NM, INC.,**

 Intervenor-Petitioner.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
Raymond Z. Ortiz, District Judge**

Hector H. Balderas, Attorney General
Kathryn S. Becker, Special Assistant Attorney General
Santa Fe, NM

for Respondent

Hector H. Balderas, Attorney General
John Kreienkamp, Assistant Attorney General
Santa Fe, NM

for Appellee

Sommer, Udall, Hardwick & Jones, P.A.
Jack N. Hardwick

Santa Fe, NM

Finch, Thornton & Baird, LLP
Chad T. Wishchuk
San Diego, CA

for Petitioner

**MEMORANDUM OPINION**

**IVES, Judge.**

**{1}** This appeal involves four citations that the New Mexico Environment Department's Occupational Health and Safety Bureau (the Bureau) issued to McCarthy Building Companies NM, Inc. (McCarthy) for alleged violations of safety standards pertaining to scaffolds. McCarthy prevailed before the New Mexico Occupational Health and Safety Review Commission (the Commission), which issued a final decision (the Decision) vacating the citations. The Bureau appealed to the district court pursuant to NMSA 1978, Section 50-9-17(G) (1999). The district court reversed the Decision, concluding that (1) the Commission should have considered the transcripts of several witness interviews the Bureau had conducted and (2) the Decision is not supported by substantial evidence. We granted McCarthy's petition for certiorari pursuant to Rule 12-505 NMRA. We conclude that the Bureau has not shown that the Commission committed reversible error, and we therefore reverse the district court and affirm the Commission.

**DISCUSSION**

**{2}** We "conduct the same review of an administrative order as the district court sitting in its appellate capacity, while at the same time determining whether the district court erred in the first appeal." *Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 16, 133 N.M. 97, 61 P.3d 806. "In a proceeding for judicial review of a final decision by an agency, the district court may set aside, reverse or remand the final decision if it determines that: (1) the agency acted fraudulently, arbitrarily or capriciously; (2) the final decision was not supported by substantial evidence; or (3) the agency did not act in accordance with law." NMSA 1978, § 39-3-1.1(D) (1999); *see* Rule 1-074(R) NMRA. "The party challenging an agency decision bears the burden on appeal of showing that agency action falls within one of the oft-mentioned grounds for reversal[.]" *Regents of the Univ. of N.M. v. N.M. Fed'n of Tchrs.*, 1998-NMSC-020, ¶ 17, 125 N.M. 401, 962 P.2d 1236 (internal quotation marks and citations omitted).

**{3}**     The only argument that the Bureau has adequately developed[1] on appeal is that the evidence is insufficient to support the Commission's Decision. We disagree.

**{4}**     We will not disturb the Commission's conclusion if it is supported by substantial evidence in the administrative record. *See id.* " 'Substantial evidence' is evidence that a reasonable mind would regard as adequate to support a conclusion." *Id.* In determining whether substantial evidence exists, we review the whole record, *id.*, "view[ing] the evidence in the light most favorable" to the Commission's Decision without "total disregard [for] contravening evidence." *DeWitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 12, 146 N.M. 453, 212 P.3d 341 (internal quotation marks and citation omitted).

**{5}**     The Bureau argues that, contrary to the Commission's Decision, the evidence presented at the administrative hearing was sufficient for the Bureau to carry its burden of proof as to each of the alleged violations. The Bureau characterizes its burden at the administrative hearing as one of showing that McCarthy, as a controlling employer under the federal Multi-Employer Citation Policy (Directive), Occupational Health & Safety Admin., Directive CPL 02-00-124, Multi-Employer Citation Policy (1999),[2] failed to take reasonable care to "detect or prevent the overloading of the scaffolding." The Bureau challenges the Commission's conclusion of law that McCarthy satisfied its duty of care, contending that the evidence shows that McCarthy must have "see[n] that multiple layers of the scaffold were being loaded at the same time." The Bureau asserts the issue was in "plain sight" and that "the overloading and [a] lack of ties" were "visually obvious over the course of the days and weeks leading up to the scaffolding collapse." McCarthy does not dispute the existence of violations at the time of collapse, but it argues that, even if it was a controlling employer under the Directive, it was not citable for those violations.

---

1The Bureau does not contend that the Commission acted fraudulently, arbitrarily, or capriciously, and we reject as undeveloped the Bureau's contention that the Commission acted contrary to law by declining to consider the transcripts of interviews the Bureau had conducted of witnesses to the collapse and the events that precipitated it. The Bureau urges us to conclude that the district court, in its review of the Decision, correctly found the transcripts admissible under either the exception to the rule against hearsay for records of a regularly conducted activity or the public records exception. *See generally* Rule 11-803(6), (8) NMRA. But the Bureau has not developed an argument in this Court as to how the transcripts satisfy the requirements of either exception. Thus, even assuming that the Commission was required to consider the transcripts if they are admissible under the Rules of Evidence, we are left to guess at why the Bureau believes them to be admissible under either hearsay exception it has named, and we therefore decline to review the argument any further. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 (explaining that reviewing undeveloped arguments "creates a strain on judicial resources and a substantial risk of error"). The Bureau has not shown that the Commission clearly abused its discretion by excluding the transcripts, *see Claridge v. N.M. State Racing Comm'n*, 1988-NMCA-056, ¶ 35, 107 N.M. 632, 763 P.2d 66, and, therefore, has not carried its burden of showing that the Commission acted contrary to law. *See Regents of the Univ. of N.M.*, 1998-NMSC-020, ¶ 17.
2The purpose of the Directive is to aid in the determination of whether, on a multi-employer worksite, "more than one employer [is] citable for a hazardous condition that violates an OSHA standard." *Id.* at (X)(A). The Bureau's Field Operations Manual permits the use of the Directive as "guidance when citing employers at a multi-employer worksite[,]" and the Bureau called witnesses who testified that the Bureau used the Directive in this case.

**{6}** Because neither party argues that the Commission erred by relying on the Directive in reviewing whether McCarthy was citable under applicable law, we view the evidence in this case through the lens of the Directive,[3] which imposes different responsibilities on "controlling employers" than it imposes on "exposing employers." A controlling employer "has general supervisory authority over the worksite, including the power to correct safety and health violations itself or require others to correct them." Directive, *supra*, at (X)(E)(1). The "controlling employer must exercise reasonable care to prevent and detect violations on the site." *Id.* at (X)(E)(2). However, "[t]he extent of the measures that a controlling employer must implement to satisfy this duty of reasonable care is less than what is required of an employer with respect to protecting its own employees." *Id.* "This means that the controlling employer is not normally required to inspect for hazards as frequently or to have the same level of knowledge of the applicable standards or of trade expertise as the employer[s] it has hired"—i.e., subcontractors. *Id.* When a subcontractor qualifies as an "exposing employer"—an employer "whose own employees are exposed to the hazard[,]" *id.* at (X)(C)(1)—the subcontractor must "take steps consistent with its authority to protect [its] employees" from hazardous conditions that it knows of or that it could discover through the exercise of "reasonable diligence." *Id.* at (X)(C)(2). And when "the exposing employer lacks the authority to correct the hazard," it must "(1) ask the creating and/or controlling employer to correct the hazard; (2) inform its employees of the hazard; and (3) take reasonable alternative protective measures." *Id.*

**{7}** Here, the Commission determined that the Bureau failed to prove that McCarthy was either a controlling employer or an exposing employer under the Directive, but the Commission nevertheless concluded that McCarthy exercised the reasonable care required of a controlling employer under the circumstances. Specifically, the Commission concluded that McCarthy did not know or have reason to know of the safety violations at issue and that McCarthy thus satisfied its duty of care. Deferring to the Commission's expertise in our whole-record review of its fact-bound determinations,[4] *see Regents of the Univ. of N.M.*, 1998-NMSC-020, ¶ 17, we hold that substantial evidence supports the Commission's conclusions.

**{8}** McCarthy presented considerable evidence about the efforts it made, both directly and indirectly through its subcontractors, to ensure that the scaffold was safe. There was evidence before the Commission that Stone Cold, the subcontracting masonry company whose own employees were exposed to the hazardous condition of the scaffold, had employed a competent scaffolding person. *See generally* 29 C.F.R. § 1926.32(f) (2020) (defining "competent person" as "one who is capable of identifying

---

3We express no opinion about whether it would be appropriate to rely on the Directive under any other circumstances.

4We reject the Bureau's contention that the Commission lacks the requisite industry expertise because the Bureau has neither developed an argument that NMSA 1978, Section 50-9-9(A) (1975), which prescribes the composition of the Commission, does not require the appointment of members with such expertise, *see Elane Photography, LLC*, 2013-NMSC-040, ¶ 70, nor supported its assertion that the members of the Commission who decided this case lacked sufficient expertise. *See Muse v. Muse*, 2009-NMCA-003, ¶ 51, 145 N.M. 451, 200 P.3d 104 ("It is not our practice to rely on assertions of counsel unaccompanied by support in the record.").

existing and predictable hazards in the surroundings or working conditions which are unsanitary, hazardous, or dangerous to employees, and who has authorization to take prompt corrective measures to eliminate them"). The Commission also considered evidence that Stone Cold's competent scaffolding person used a tagging system to proclaim the scaffold safe to use each workday in August 2015, including August 18, the day it collapsed. William Naylor, McCarthy's Southwest Divisional Safety Director, testified that all of McCarthy's superintendents are required to complete a thirty-hour OSHA course that includes a thirty-minute session on scaffolding. And J. Robert Harrell, a construction industry safety consultant whom McCarthy hired to determine whether it had satisfied its duty of care, explained that someone who has done a thirty-hour OSHA course should understand the system for tagging scaffolds and be able to determine whether a scaffold is properly tied to a building. However, Harrell opined that McCarthy was not obligated to employ its own competent scaffolding person and that, unless McCarthy had notice of a scaffolding issue, its subcontractors were solely responsible for inspecting the scaffold both before and during its use. And Naylor opined that McCarthy was entitled to rely on the representations of its subcontractors' competent scaffolding persons regarding whether the scaffold was safe.

{9}     Still, Matthew Kerr, one of McCarthy's project superintendents, testified that once per month, at the end of the month, he would inspect "each section of scaffolding" among other parts of the worksite. The record includes a report of such an inspection on July 31, approximately three weeks before the collapse, where Kerr did not note any scaffolding problems. Kerr testified further that he did not observe work occurring on multiple levels of the same scaffold at once in the week prior to the collapse and that he was neither told about missing ties nor presented with a stop-work card relating to overloading or missing ties. And Carl Dudzinski, one of McCarthy's project managers, testified that he walked the site weekly and would have intervened if he saw work happening on multiple levels of a scaffold at once, but never witnessed that, and that at no point prior to the collapse did anyone report to him that a scaffold was overloaded or missing ties. McCarthy also presented evidence of the opportunities it afforded subcontractors to report safety concerns: that McCarthy held weekly, site-wide safety meetings; that, at the time of the collapse, McCarthy was holding daily meetings with the subcontractors who were working on the exterior of the building; and that one such meeting occurred the morning of the collapse.

{10}     The Bureau does not contend that McCarthy should have had safety personnel on site the day of the collapse or that any of its personnel actively oversaw their subcontractors as they worked on the scaffold that day.[5] Instead, the Bureau contends

---

[5]No McCarthy safety personnel were on site the day of the collapse, and none of the McCarthy employees who testified at the hearing witnessed the collapse or the events that immediately precipitated it. Insofar as the Bureau contends that McCarthy should have been inspecting the scaffold more vigilantly or that its personnel should have been more knowledgeable about scaffolding, the Bureau has not explained why that would be so when the Directive provides that a controlling employer is not required to inspect for hazards as frequently or have the same level of expertise as its subcontractors. Directive, *supra*, at (X)(E)(2). Because the Bureau has not explained what frequency of inspection or expertise in scaffolding it believes the Directive required of McCarthy, we have no reason to conclude that McCarthy's

that McCarthy had reason to know of the violations at issue, citing the testimony of Bureau Chief Robert Genoway that the hazardous condition of the scaffold "should have been readily apparent to any contractor on site with a basic knowledge of scaffolding requirements." The Bureau's argument relies on the theory that the way in which Stone Cold loaded and installed block on the day of the collapse was the same as or similar to the way it had done so in the past. In other words, the Bureau urged the Commission to conclude that Stone Cold had consistently overloaded the scaffold, worked on it when other subcontractors were working on other levels, and removed ties rather than working around them. However, through the testimony of Randall Poston, a structural engineer whom McCarthy hired to investigate the cause of the collapse, McCarthy introduced evidence that the collapse was the "sudden and abrupt" result of a "gross[] overload[ing]" of the scaffold that would have occurred over two-and-a-half to three hours. Based on the evidence presented at the administrative hearing, the Commission could have reasonably (1) declined to accept the Bureau's theory that the safety violations that led to the collapse were recurring or (2) concluded that, even if the violations were recurring, McCarthy's personnel would not have had reason to be aware of them. We therefore decline to disturb the Commission's determinations that McCarthy did not know or have reason to know of the hazardous condition of the scaffold and that McCarthy thus satisfied its duty to exercise reasonable care.

**{11}**   In urging us to affirm the district court, the Bureau seems to misunderstand the applicable standard of review. The Bureau argues, for example, that we should affirm the district court's reversal of the Commission's Decision because "McCarthy has not met [its] burden of showing that [the district court's order] is an abuse of discretion." This is incorrect in two respects. First, this Court owes deference not to the district court but instead to the Commission because of its expertise in the field of workplace safety and its role as the fact-finder and the only tribunal with the opportunity to make credibility determinations after observing the live testimony of witnesses. *See Rio Grande Chapter of the Sierra Club*, 2003-NMSC-005, ¶ 17; *Regents of the Univ. of N.M.*, 1998-NMSC-020, ¶ 17. Second, the burden of establishing error in this Court is not on McCarthy, which prevailed before the Commission, but instead on the Bureau because it is the party seeking to undo the Commission's Decision. *See Regents of the Univ. of N.M.*, 1998-NMSC-020, ¶ 17. The Bureau, focusing on evidence that McCarthy did not act with reasonable care, fails to carry that burden. We acknowledge that there is some evidence in the record that, if credited by the Commission, could support an inference that McCarthy's personnel should have recognized that the scaffold was unsafe despite their limited training on scaffolding and Stone Cold's representations that it was safe. But that evidence does not warrant reversal of the Commission. Even if there is substantial evidence to support the citations, we do not have a reason to reverse the Commission because its conclusion that McCarthy exercised reasonable care is supported by substantial evidence, as we have explained. *See Gallup Westside Dev., LLC v. City of Gallup*, 2004-NMCA-010, ¶ 11, 135 N.M. 30, 84 P.3d 78 (explaining that, when this Court reviews whether an administrative decision is supported by substantial

---

efforts did not satisfy its obligations as the controlling employer. *See Elane Photography, LLC*, 2013-NMSC-040, ¶ 70.

evidence, it "only evaluate[s] whether the record supports the result reached, not whether a different result could have been reached"); *cf. DeWitt*, 2009-NMSC-032, ¶ 25.

**{12}** Having reviewed the whole record, we hold that the Commission based its Decision upon substantial evidence.

**CONCLUSION**

**{13}** We reverse the district court's order and affirm the Decision of the Commission.

**{14}  IT IS SO ORDERED.**

**ZACHARY A. IVES, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**JANE B. YOHALEM, Judge**